SAFEWAY TRAILS, INC., APPELLANT, v. BOARD OF PUBLIC UTILITY COMMISSIONERS, DEPARTMENT OF PUBLIC UTILITIES, STATE OF NEW JERSEY, RESPONDENT.

IN THE MATTER OF THE PETITION OF THE GREYHOUND CORPORATION, SAFEWAY TRAILS, INC., AND THE NATIONAL ASSOCIATION OF MOTOR BUS OWNERS FOR REHEARING AND RECONSIDERATION OF SPECIFICATIONS 3, 4 AND 6 OF ADMINISTRATIVE ORDER 14:212—SPECIFICATIONS APPLYING TO AUTOBUSES— DOCKET No. 10790.

THE GREYHOUND CORPORATION, ETC., AND THE NATIONAL ASSOCIATION OF MOTOR BUS OWNERS, ETC., APPELLANTS, v. BOARD OF PUBLIC UTILITY COMMISSIONERS, DEPARTMENT OF PUBLIC UTILITIES, STATE OF NEW JERSEY, RESPONDENT.

Argued May 19, 1964—Decided June 23, 1964.

526

*Mr. Morris J. Levin,* of the District of Columbia Bar, argued the cause for the appellant, Safeway Trails, Inc. (*Messrs. Harrison & Jacobs,* attorneys; *Messrs. Roberts & McInnis,* of the District of Columbia Bar, on the brief).

*Mr. Merritt Lane, Jr.,* and *Mr. Harold J. Drescher,* of the New York Bar, argued the cause for the appellants, The Greyhound Corporation and The National Association of Motor

Bus Owners (*Messrs. McCarter & English,* attorneys; *Messrs. Michael D. LoPrete* and *Ross B. Abrash,* on the brief).

*Mr. Richard F. Green,* Deputy Attorney General, argued the cause for the respondent, Board of Public Utility Commissioners, Department of Public Utilities, State of New Jersey. (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

PROCTOR, J. The appellants, Safeway Trails, Inc. (Safeway), Greyhound Corporation (Greyhound), and The National Association of Motor Bus Owners (NAMBO), challenge the validity of revisions to Specifications 3, 4 and 6 of Administrative Order 14:212 promulgated by the Board of Public Utility Commissioners (Board) on December 16, 1960, as applied to interstate-intercity deluxe buses. These specifications provide:

"3. Guard Rail

All autobuses shall be equipped with a suitable guard rail or gate which will prevent passengers from occupying any space forward of the plane of the back of the driver's seat when the bus is in motion.

4. Partition and Curtain

All autobuses shall be equipped with a partition of wood or metal and wire glass or safety glass with a suitable curtain to shield the driver from the glare of inside lights, located to the rear of the driver's seat. Not later than January 1, 1962, all autobuses must comply with this provision in a manner satisfactory to the Board.

6. Emergency Exits

(a) An emergency door located in the center of the rear vertical plane of the bus body or in the left side of bus body between the center of the bus and the extreme rear of the bus body shall be provided. The emergency door shall have a clearance with the door open of not less than 10″ at the floor line and not less than 18″ from a point 12″ above the floor line to the upper belt panel.

(b) The emergency door shall be conspicuously marked.

'EMERGENCY DOOR'

on the inside of the bus body.

(c) The emergency door shall be constructed and maintained in such condition as to be readily opened by passengers in case of emergency.

(d) A clear passage to the emergency door of not less than 10″ in width and free from all obstruction shall be provided and maintained.

(e) The emergency door shall be equipped with an audible or visible signal to warn the driver when the door is not completely closed.

(f) In addition to the emergency door, each autobus shall have adequate means of escape for passengers through push-out type windows.

(g) Each push-out type window so constructed shall have a frame or sash so designed, constructed and maintained as to provide free opening with a minimum of effort.

(h) Each push-out type window shall be identified as such by clearly legible and visible signs, lettering or decalcomania. Such marking shall include appropriate wording to indicate that it is an escape window."

Regulation of bus specifications in New Jersey dates back to 1927, at which time an emergency door was required on all buses, and a guard rail and partition were required on buses transporting passengers in excess of seated capacity. In 1954 the Board permitted Greyhound to substitute push-out windows in lieu of an emergency door in its Scenicruiser bus (GMC Model PD-4501), and in 1957 the Board amended its specifications to permit the use of at least four push-out windows in lieu of an emergency door. In 1952 the Interstate Commerce Commission had changed its regulations so that there was no requirement for an emergency door on buses operated under its jurisdiction; however, there were at that time 19 states which required such a door. At the present time, New Jersey is the only jurisdiction in the continental United States which requires an emergency door and the other equipment covered by these specifications on interstate deluxe buses.

Appellants Safeway and Greyhound are interstate bus operators operating under authority granted by the Interstate Commerce Commission. Both carriers also conduct a minimal intrastate service in New Jersey.

. Greyhound is essentially an interstate-intercity bus operator with approximately 5,000 buses, 1,359 of which are assigned to intracompany pools which operate in New Jersey. These buses are GMC Models PD-4104, PD-4501 (Scenicruiser) and PD-4106. All have push-out windows; the

PD-4104 (no longer in production) also has an emergency door; none of them has a driver partition or aisle gate. These buses are not designed to nor do they normally carry standees.

Safeway's principal operations are between Washington and New York City and Philadelphia and New York City. In 1961 Safeway owned and operated in this service 129 interstate-intercity deluxe buses, mainly GMC Models PD-4104 and PD-4106, and a few foreign built Kassbohrers. The Kassbohrer bus has push-out windows, no emergency door and no driver partition or aisle gate. Safeway is a member of National Trailways Bus System (Trailways), an unincorporated association of 42 to 44 independent bus companies which have combined to meet public demands for long-distance bus service throughout the nation. The heart of the Trailways operation is their pooling agreements under which the individual companies contract with each other to pool their equipment and franchises to permit a single bus to operate over the routes of a number of the companies. For example, one bus originating in Boston or New York may be driven through the franchise area of several Trailway carriers, terminating in Florida or Texas. Pools of equipment belonging to the various carriers who hold franchises along the route are set up for each route. Each carrier supplies its own driver for the trip through its area. Thus the equipment of many other companies must qualify to operate in New Jersey in order to participate in the pooling arrangements deemed essential by Safeway to effective service and competition.

By letter dated September 28, 1960, the Board gave notice of a hearing on proposed revisions of the Board's Rules of Practice, Suggested Procedures and Administrative Orders, to be held on November 14, 1960. A copy of the proposed changes accompanied the letter, and interested parties were invited to submit written comments and suggestions on or before October 31, 1960. The proposed revisions covered 42 items, including the three changes here challenged.

On November 14, 1960 attorneys for appellants, other bus companies, and other utilities appeared before the Board.

Most of the discussion was concerned with proposals other than those relating to equipment requirements on buses. Although there was some discussion by the Board and bus industry representatives about the bus equipment proposals, at no time was any material or testimony in support of the proposed changes presented by the Board or its staff, and the Board declined to hear oral testimony offered by the appellants respecting the financial effect on the operators of the proposed changes. When it became apparent that there was opposition to the proposals, the presiding commissioner suggested that the industry representatives organize and consolidate their views, and that a conference would then be arranged between an industry committee and members of the Board's Motor Carrier Division and its engineering personnel, if feasibility of the changes was questioned. The matter was thus adjourned with further comments to be submitted by the industry committee on or before November 28, 1960. Counsel for Greyhound welcomed the suggestion noting that the carriers hoped thereby to obtain the thinking of the Board's staff that led to the proposals. There is nothing in the record to indicate what occurred at the suggested conference, or whether such a conference in fact took place. On December 16, 1960 the Board issued its order adopting the revised specifications printed *supra*, effective January 30, 1961.

On October 17, 1961 appellants petitioned the Board requesting a rehearing on the adoption of the revised specifications insofar as they were to be applied to interstate-intercity deluxe buses. *Rule* 14:14–1 of the Board's Rules of Practice provides that a motion for rehearing may be filed within 15 days after issuance of an order. However, pursuant to its Rule 14:1–2 the Board relaxed its time requirement and set the matter for hearing as requested. Hearing was commenced on December 12, 1961, and continued for 12 days, concluding on January 26, 1962. The Board issued its decision on February 28, 1963, finding that the revised specifications "constitute a reasonable exercise of the Board's power and obligation

to promulgate rules and regulations designed to provide safe, adequate and proper service * * *."

At the outset of the rehearing the appellants requested that the Board first present evidence or material on which it relied in promulgating the changes so that they would thereafter be in a position to refute or rebut the legislative facts which formed the basis for the Board's action. Counsel for the Board took the position that the Board could rely upon its experts and staff to advise it as to safety needs and the adoption of rules and that it was not required to present evidence to support its rules and regulations. The Board agreed with the views of its counsel, and the appellants were required to proceed first.

Appellants presented oral and documentary evidence to the effect that the new regulations would not increase safety on interstate-intercity deluxe buses but were likely to be hazardous. They also demonstrated that the regulations would place a heavy financial burden on their companies ( e. g., approximately $2,400 per bus or an estimated $1,325,000 cost to Greyhound for 1962) and would result in the debilitation or possible demise of Safeway's through interstate service which is dependent on pooling agreements with 21 other Trailways carriers, none of which are franchised to operate in New Jersey, and who could not be compelled by Safeway to equip their buses to comply with the new regulations.

A coach engineer of the GMC Truck and Coach Division of General Motors Corporation testified concerning the history of improved safety features on interstate deluxe buses. He pointed out that the present model PD-4106 was the only bus available from GMC for interstate-intercity deluxe service. The initial planning for this model began in 1958 and it went into production in January 1961. It was designed to meet all state and ICC safety regulations and exceeded New Jersey's prior requirements for emergency exits. It has no emergency door, aisle guard rail, or driver's partition, but is equipped with eight push-out windows, each measuring approximately two feet by six feet, a white line and sign to keep

passengers from occupying space forward of the driver's seat, and a guard rail behind the driver's seat to protect him from physical contact with the passengers. He gave his opinion, based on his experience and that of GMC, that the new regulations would not bring about an increase in safety. While he testified that GMC could feasibly design an aisle guard rail and driver's partition for the PD-4106, he left in considerable doubt the feasibility of providing an emergency door on the PD-4106. He testified that the installation of such a door would weaken the frame, which would have to be strengthened by steel gusseting, that thorough testing would be required before releasing the vehicle to production to assure that the new structure was still sufficiently strong. He stated that from an engineering standpoint, a much stronger vehicle could be built with emergency windows in place of the emergency door. The steel gusseting and door would add from 200 to 250 pounds to the weight of the rear axle, presently 17,990 pounds, thus exceeding 18,000 pounds, the maximum per axle weight permitted in 30 states.

As of January 1961, 70% of all deluxe interstate buses in operation in the United States were manufactured by GMC. Many manufacturers have left the field, and it is clear that GMC now provides well over that percentage of new buses reaching the operators. Greyhound, which requires some 500 new buses each year essentially has no other source of supply, since none of GMC's competitors can produce in such quantities. A former officer of the Pennsylvania State Police, with considerable experience in the promulgation of bus safety equipment regulations, testified to the lack of need for the new specifications and the possible dangers inherent in them.

In rebuttal, seven staff employees of the Board's Motor Carrier Division testified that the new regulations would increase safety. Their testimony was based upon their experience in inspecting buses (mainly transit and suburban types) for compliance with the Board's regulations and in investigating accidents. None of these witnesses had any safety engineering training or experience. They relied upon

observations and inspections made after the Board had issued its order promulgating the new regulations. None of these witnesses had made a written recommendation on which the Board could have based its proposed changes; in fact, the record indicates that there were no recommendations or reports filed with the Board prior to the promulgation of the new regulations. A traffic engineer of the Motor Vehicle Department also testified as to the desirability of the proposed equipment; however, on cross-examination he recognized the possible hazards attendant upon the use of this equipment and admitted that he had not studied the problem since he had just recently been called into the matter. The Board offered no technical or engineering evidence relating to bus construction or the feasibility of the proposed equipment. Nor did it present any technical or engineering evidence which weighed the safety advantages and disadvantages of the new regulations to demonstrate their total effect upon the safety of interstate deluxe buses.

The Board's order of February 28, 1963 denied the relief requested in appellants' petition, with the exception that permission was granted appellants to eliminate the curtain required under Specification 4 on their Models PD-4104 and PD-4106. On April 8, 1963 Safeway filed a notice of appeal with the Appellate Division, and on April 11, 1963 Greyhound and NAMBO filed a similar notice of appeal as well as a petition for a declaratory judgment that the revised specifications were invalid and of no effect as applied to interstate-intercity deluxe buses. On the motion of the Board, the Appellate Division ordered consolidation of the two appeals and dismissed the petition for declaratory judgment, without prejudice to Greyhound and NAMBO to raise on the appeal all matters contained in their petition. The consolidated appeals were certified by this court prior to argument in the Appellate Division.

The Board argues that these appeals are taken from the order of the Board of December 16, 1960, from which order the time to appeal expired on July 24, 1961, and accord-

ingly that they are far out of time and must be dismissed. The contention is without merit. Pursuant to its rules the Board relaxed its rule limiting the time in which rehearing might be sought, granted appellants a rehearing, and considered the matter on its merits. These appeals, though they put in issue the validity of the Board's order of December 16, 1960, nevertheless are taken from the final order of the Board dated February 28, 1963, and were filed within 45 days from that date in compliance with *R. R.* 1:3–1(b).

Appellants contend that the order of the Board must be set aside because of its failure to hold a proper hearing on the promulgation of the revised specifications. On the other hand, the Board contends that it was not required to hold any hearing before promulgating its regulations. However, the action of the Board in notifying interested parties of the proposed changes in September 1960, setting the matter down for hearing, holding a public hearing on November 14, 1960, and later adopting the statutory language of *N. J. S. A.* 48:2–23 in its order of February 28, 1963, as quoted *supra,* appears to us to be somewhat inconsistent with its present contention that no hearing was required.

The Board's function in prescribing safety regulations is essentially legislative in nature, and whether a hearing is required prior to their promulgation depends upon the statute empowering the Board to act. *Pennsylvania Railroad Co. v. Dept. of Public Utilities,* 14 *N. J.* 411, 426 (1954). The appellants argue that the Board's action must be justified, if at all, under the following provisions of *Title* 48:

"48:2–23  Safe and adequate service
The board may, after hearing, upon notice, by order in writing, require any public utility to furnish safe, adequate and proper service and to maintain its property and equipment in such condition as to enable it to do so."

"48:2–25  Standards, classifications and measurements of service
The board may, after hearing, by order in writing:
(a) Fix just and reasonable standards, classifications, regulations, practices, measurements or service to be furnished, imposed, observed, and followed thereafter by any public utility;  *  *  *."

On the other hand, the Board contends that the revision of the specifications is authorized by either or both of the following sections of *Title* 48, neither of which, it is argued, requires a hearing, and that therefore the provisions referred to by appellants are inapplicable to the present proceedings:

"48:2-12. Rules
The board may make all needful rules for its government and other proceedings."

"48:4-18. Construction and equipment
The board of public utility commissioners may prescribe reasonable regulations with respect to the construction and equipment of autobusses carrying passengers between points in this state and points in other states. Such regulations shall be consistent with regulations prescribed by the board applying to the operation of autobusses between points in this state."

*R. S.* 48:2-12 on its face indicates a grant of internal rule-making powers under which the Board may adopt procedural rules to govern the manner in which it will carry out the duties and functions delegated to it by the Legislature. Clearly it was not intended to empower the Board to issue substantive rules for the regulation of public utilities. If it were, the numerous subsequent specific statutory provisions delegating regulatory power (*e. g., N. J. S. A.* 48:2-23 and 48:2-25) would be superfluous.

By enacting *R. S.* 48:4-18 the Legislature extended the Board's jurisdiction to buses carrying passengers between points in New Jersey and points in other states. While the section empowers the Board to regulate the equipment of such buses it expressly provides that such regulations be consistent with those applying to intrastate buses. The manner in which this new power is to be exercised is not stated. The Board's order of December 16, 1960 expressly extends to all buses subject to its jurisdiction, intrastate as well as interstate. But the Board's authority to regulate the safety equipment of intrastate buses is contained in *N. J. S. A.* 48:2-23 and 48:2-25, which require notice and hearing. Thus were the Board acting only under *R. S.* 48:4-18, the validity of

these regulations with respect to intrastate operators would be subject to attack, and as to interstate carriers, a serious constitutional question of the denial of equal protection might arise. But in any case, the Legislature's mandate for consistency of regulations for both interstate and intrastate buses in *R. S.* 48:4–18 convinces us that it was intended that regulations of interstate bus equipment be promulgated in accordance with the procedural safeguards required by *N. J. S. A.* 48:2–23 and 48:2–25. Accordingly, we hold that the Board was required to proceed in accordance with *N. J. S. A.* 48:2–23 and 48:2–25 in promulgating the revisions to its specifications. The next question, therefore, is whether the appellants were afforded a hearing of the type contemplated by these sections of the statute.

In *Pennsylvania Railroad Co. v. Dept. of Public Utilities, supra,* this court discussed in detail the hearing requirements of *N. J. S. A.* 48:2–23 and 48:2–25. Justice Jacobs, speaking for the Court, said the hearing required by these sections "is not a formality which may be disregarded but is a substantial protective device prescribed by the Legislature to afford the interested parties fair opportunity to be heard and refute such evidence or material as the board may rely upon to support its action. * * * In the course of the hearing the board must be given full latitude to avail itself of the wealth of general information and expert knowledge which it obtains in the performance of its day-to-day administrative activities. * * * By taking appropriate official notice, making it a part of the hearing record, and affording fair opportunity of refutation, the Board may adequately protect both the public and private interests concerned." 14 *N. J.*, at *pp.* 426–427.

It is apparent, and the Board does not otherwise contend, that the hearing of December 14, 1960 did not conform to the above requirements. The material or other evidence upon which the Board relied in proposing the revisions was not made a part of the record, and accordingly the appellants had no opportunity to refute the legislative facts upon which the proposed action was based.

Though the Board granted the appellants' petition for rehearing and reconsideration of the revised specifications, it is apparent that it did not view the rehearing as a reconsideration of the legislative wisdom of these specifications. Rather, the Board, in the conduct of the hearing, in the tenor of its opinion, and in its brief filed with us, appears to have misconceived its function and viewed the petition for rehearing solely as an attack upon the reasonableness of a presumptively valid regulation. Once having granted the petition for rehearing, the Board should have considered the matter *de novo,* presented evidence and material indicating the need for and advantages to be derived from the equipment, afforded appellants an opportunity to refute such evidence and material, and then exercised its legislative judgment after weighing the burdens and benefits of the proposed changes. This it failed to do. Again, no testimony or material respecting the legislative facts on which the Board had relied in adopting the changes was put in evidence. The appellants, however, made a persuasive showing that the hazards attendant upon the installation of this equipment outweighed the safety advantages to be derived from it. While there was considerable opinion testimony offered by the Board in rebuttal as to the desirability of the changes, it presented little or no evidence to meet many of the practical difficulties testified to by the appellants' witnesses in complying with the specifications, *e. g.,* the danger of children's opening the emergency door and being injured, the likelihood that the passenger behind the driver or the driver himself would strike his head on the glass partition in the event of a sudden stop or collision, the mechanical problems involved in the operation of the aisle gate and its impediment to the driver's mobility, and most significantly the questionable feasibility from an engineering standpoint of installing an emergency door on the PD-4106. Nor did the Board present any evidence to meet that offered by appellants on their claim that the revised specifications severely burdened interstate commerce. See *Southern Pacific Co. v. Arizona,* 325 *U. S.* 761, 775–776, 65 *S. Ct.* 1515, 1523,

89 *L. Ed.* 1915, 1928 (1945) ; *Bibb v. Navajo Freight Lines,* 359 *U. S.* 520, 528, 79 *S. Ct.* 962, 967, 3 *L. Ed. 2d* 1003, 1009 (1959). Moreover, there was no persuasive evidence of any local conditions in New Jersey that would require more stringent regulations with respect to this equipment than those of other states and the ICC. *Cf. Sproles v. Binford,* 286 *U. S.* 374, 390, 52 *S. Ct.* 581, 585, 76 *L. Ed.* 1167, 1180 (1932). Though a Board witness testified that New Jersey is a "corridor" state and has a greater traffic density than other states, he admitted that his statistics did not include traffic on the New Jersey Turnpike and the Garden State Parkway —the main corridors through the State. And he admitted that New Jersey had an exceptionally good traffic safety record compared to other states.

■ The Legislature in providing for notice and hearing prior to the adoption of safety regulations intended that the Board would exercise its delegated power only after a consideration of all pertinent legislative facts relating to the desirability, feasibility, and public need for the proposed regulations. It may be that the Board relied on some unknown study or report of its staff or others in adopting these rules. But even in its opinion we find no indication of the legislative facts upon which the Board relied. If there are in fact such studies or reports, it is in the public interest that they be brought to light so that the appellants may contest their accuracy or worth. It is only in this way that both public and private interests are fully protected and the agency has the opportunity to weigh both the advantages and disadvantages of the proposed rules before exercising its legislative judgment.

■ We might in a proper case excuse the failure of the Board to put in evidence the specific materials on which it relies in promulgating its rules, where a reasonable basis for the adoption of the regulations appears in the record and it otherwise indicates that the interested parties were in fact aware of the underlying reasons or were not prejudiced. For as stated in *Pennsylvania Railroad Co. v. Dept. of Public*

*Utilities, supra,* the procedural requirements there outlined are not to be applied to particular administrative proceedings when good sense and justice dictate otherwise. 14 *N. J.,* at *p.* 427, 102 *A. 2d,* at *p.* 618. But here, we still do not know what legislative facts the Board relied on in originally promulgating the regulations, and because of the view it took of its function at the rehearing, we are not satisfied that it ever properly weighed the burdens and benefits of the regulations. Moreover, we have some doubt whether there is substantial compctent and relevant evidence to support the Board's findings and conclusions. We are convinced that to uphold the order on this record would be prejudicial to the appellants' rights to a fair hearing and violative of the public interest in a well-informed exercise by the Board of its delegated power.

Appellants further contend that the order of the Board is of no effect as applied to their interstate operations because the Interstate Commerce Commission has pre-empted the field of safety regulations on interstate buses. Alternatively they argue that the regulations destroy the uniformity necessary in the field of safety appliances and burden interstate commerce in violation of the Federal Constitution. On the record before us the arguments made are not unpersuasive, but since the matter must be remanded to the Board, it is unnecessary for us to consider them at present. However, if on the remand and following a rehearing and reconsideration the Board decides to promulgate these or similar specifications, it will be required to consider these arguments of the appellants before so doing. For this reason we note our disagreement with the narrow view taken by the Board of *Bibb v. Navajo Freight Lines, supra.* See the discussion of this case in "The Supreme Court, 1958 Term," 73 *Harv. L. Rev.* 84, 168 (1959). The *Bibb* case restates the principle that the total effect of the state regulation as a safety measure must be balanced against the national interest in a free flow of commerce. As stated in *Southern Pacific Co. v. Arizona, supra,* "The decisive question is whether in the circumstances the total effect of the law as a safety measure in reducing accidents and casualties is so

slight or problematical as not to outweigh the national interest in keeping interstate commerce free from interferences which seriously impede it and subject it to local regulation which does not have a uniform effect on the interstate [operation]." 325 *U. S.*, at *pp.* 775–776, 65 *S. Ct.*, at *p.* 1523, 89 *L. Ed.*, at *p.* 1928. The questions before the United States Supreme Court in both those cases appear to us to closely parallel the issues presented here. We suggest that the Board consider the burden on interstate commerce which would result from the adoption of these or similar regulations in connection with Safeway's pooling arrangements and its inability to compel other carriers to equip their buses with the proposed equipment. See *Bibb, supra,* 359 *U. S.*, at *p.* 529, 79 *S. Ct.*, at *p.* 967, 3 *L. Ed. 2d,* at *p.* 1010.

The matter is remanded to the Board.

*For remandment*—Chief Justice WEINTRAUB, and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.