231 N.J. Super. 292 (1989)
555 A.2d 684
AMERICAN CYANAMID CO., APPELLANT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted January 9, 1989.
Decided March 2, 1989.
*295 Before Judges J.H. COLEMAN, BAIME and D'ANNUNZIO.
Lowenstein, Sandler, Kohl, Fisher & Boylan, for appellant (James Stewart of counsel; James Stewart and Anne Conley-Pitchell on the brief).
*296 Cary Edwards, Attorney General, for respondent (Ross A. Lewin, Deputy Attorney General, of counsel, Eileen Kelly, Deputy Attorney General, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
American Cyanamid, Inc. (Cyanamid) appeals from the action of the New Jersey Department of Environmental Protection (DEP) promulgating an amendment to N.J.A.C. 7:13-7.1(d). The sole modification effected by this amendment was to alter the map reflecting the outlines of the flood hazard area surrounding the Raritan River and Peters Brook. The DEP undertook to amend the maps for the Raritan River and Peters Brook to reflect updated data and hydraulic analyses prepared by the United States Geological Survey (U.S.G.S.) for federal flood insurance studies. Modification of the maps was deemed to be necessary because of changes wrought by major stream encroachment applications, flood control projects, dams, revisions requested by private individuals and alterations based upon recent federal studies. 19 N.J.R. 168. As a result of this revision, the geographic area encompassed by flood hazard regulations has been expanded corresponding to a higher theoretical flood elevation. Cyanamid owns a facility in close proximity to the Raritan River in Bridgewater Township. Under the original map, Cyanamid's facility was not subject to land use restrictions because the dike surrounding it was higher than the elevation used to calculate the perimeter of the flood hazard area. Under the revision, however, the elevation of the flood hazard area is higher and overtakes the apical point of Cyanamid's dike, thereby placing portions of the site in a geographic area subject to enhanced land use regulations.
Cyanamid argues that the DEP acted in an arbitrary and capricious manner in its revision of the map reflecting the flood hazard area. This contention is predicated upon several related claims. More specifically, Cyanamid asserts that the DEP *297 violated the requirements of the Administrative Procedure Act (N.J.S.A. 52:14B-1 et seq.) by failing to adopt standard regulations governing the methodology and computer model utilized in delineating or charting flood hazard areas. It is also argued that the DEP violated several statutory provisions which require it to identify subportions of the flood hazard area for reasonable and proper land use according to the varying degrees of danger to life and property. Cyanamid further contends that the DEP arbitrarily deviated from its own regulations by applying a substantially different flood profile than required. It is also claimed that application of restrictions encompassed by other regulations was overly broad and unjustified. Cyanamid's final argument is that the different treatment accorded to delineated and nondelineated streams is not grounded upon a rational basis.

I.
A brief description of the applicable statutes and regulations is necessary for a complete understanding of the issues presented. The Flood Hazard Area Control Act (Act), N.J.S.A. 58:16A-50, is the operative statutory scheme. The articulated objective of the Act, and hence the primary mission of the DEP, is to protect the "safety, health, and general welfare" of the public by "delineat[ing] and mark[ing] flood hazard areas" and subjecting them to "land use regulations." N.J.S.A. 58:16A-50(b). The Act confers broad authority to the DEP to accomplish its assigned goal. Under the Act, the DEP is empowered to map flood hazard areas, adopt land regulations, control stream encroachments, coordinate the development, dissemination, and use of relevant information and integrate the control activities of municipal, county, state and federal governments. Ibid.
Perhaps, the principal function of the DEP is to "study the nature and extent of the areas affected by flooding in the State." N.J.S.A. 58:16A-52a. The Act directs the DEP *298 "[a]fter public hearings [and] upon notice, and pursuant to the Administrative Procedure Act [citation deleted] [to] adopt rules and regulations which delineate as flood hazard areas such areas as, in [its] judgment, the improper development and use of which would constitute a threat to the safety, health, and general welfare from flooding." Ibid. The Act further provides that "[s]uch delineations shall identify the various subportions of the flood hazard area for reasonable and proper use and according to relative risk, including the delineation of floodways necessary to preserve the flood carrying capacity of natural streams." Ibid. In this regard, the words "relative risk" are defined in terms of the "varying degrees of hazard to life and property in a flood hazard area which are occasioned by differences in depth and velocity of flood waters covering and flowing over it." N.J.S.A. 58:16A-51(d). The Legislature obviously envisioned changes in delineations caused by external circumstances as well as by updated data. In this respect, the Act provides that the DEP may, after public hearing and notice and subject to the provisions of the Administrative Procedure Act, "revoke, amend, alter, or modify such regulations if in its judgment the public interest so warrants." N.J.S.A. 58:16A-52a. While the Act requires the DEP to "establish a procedure for reducing any delineated flood hazard area when a change has been made which increases the flood carrying capacity of the concerned stream," N.J.S.A. 58:16A-52c, the statutory scheme is entirely silent respecting the converse situation. In other words, the statute does not mandate that the DEP adopt a procedure for redelineation expanding the flood hazard area where changes have decreased the flood carrying capacity of the stream.
As noted previously, one of the more significant functions of the DEP is to coordinate the dissemination and use of information on floods and flood damages and integrate the flood control activities of the federal, state, county and municipal governments. N.J.S.A. 58:16A-50b. The Legislature contemplated that, at least to some extent, the DEP would follow the *299 lead of the federal government in delineating flood hazard areas. N.J.S.A. 58:16A-52b states that the DEP "shall wherever practicable, make floodway delineations identical to the floodway delineations approved by the Federal Government for the National Flood Insurance Program."
Pursuant to its rule-making authority, the DEP has adopted a series of regulations designed to implement the provisions of the Act. N.J.A.C. 7:13-1.1 et seq. Where the DEP has specified the location of a flood hazard area for a particular stream, the stream is said to have been "delineated." N.J.A.C. 7:13-1.1(b)(1). When the DEP has not designated the flood hazard area for a stream, it is said to be "nondelineated." N.J.A.C. 7:13-1.1(b)(2). Since the DEP is statutorily required to make a risk assessment in choosing which streams to delineate, see N.J.S.A. 58:16A-52a, we are advised by the agency that it has delineated first the largest streams with the greatest velocity because they present an enhanced flooding danger.
The flood hazard area is determined by the "flood hazard area design flood," which is defined as the 100-year storm in nondelineated areas and the 100-year storm plus 25% (the "25% add-on") in delineated areas. N.J.A.C. 7:13-1.2. Stripped to its essentials, the flood hazard area is deemed to be that geographic expanse adjacent to a stream which will be inundated by a storm of a particular size. For nondelineated streams, the DEP uses the 100-year storm, meaning a storm of a size that is expected to occur once a century or have a one percent chance of occurring in any one year. See N.J.A.C. 7:13-1.2, which defines a "one hundred year flood plain." With respect to a delineated stream, the DEP defines the flood hazard area as the area covered by the 100-year storm plus the 25% add-on, which is an additional 25% of the volume of water created by the 100-year storm. The DEP then plots the water surface elevation for the design flood at cross-sections on a map, see 20 N.J.R. 392, and connects these elevations with lines that delineate the flood hazard area.
*300 It is important to note that the 100-year storm is not based on any actual storm. Instead, a theoretical storm is constructed by using mathematical models. A hydraulic computer model is applied to generate the width and location of the floodway at each cross-section at which the stream is measured. The water surface elevation for the design flood is plotted onto a corresponding topographical map showing relative ground elevations. 20 N.J.R. 392. Areas in which the plotting reveals the flood elevation of the theoretical design flood to be higher than the ground elevation are then included within the flood hazard area. In determining the volume of water and other characteristics of the theoretical design flood, the DEP uses one of several hydraulic computer models. Although the format of each program is different, the models apparently generate substantially the same answers. While we will describe the models generally employed later in our opinion, we merely observe at this posture that the different computer models utilized are not presently the subject of any regulation. The particular model chosen by the DEP depends upon the model used by the federal government, which is essentially a question determined by contract.
The variation in programs in State delineations thus reflects the use of a number of different computer methodologies in the federal flood insurance program. The DEP uses these models whenever possible in order to comply with the statutory mandate requiring the use of floodway delineations "approved by the Federal Government for the National Flood Insurance Program." N.J.S.A. 58:16A-52b. As we have pointed out, no single computer model is used for the federal flood insurance program because the Federal Emergency Management Agency (FEMA) contracts with a number of different agencies and private firms to perform the technical calculations by which flood-prone areas are identified. 42 U.S.C., § 4101 et seq. Under the federal statute, the Secretary of Housing and Urban Development is authorized to enter into contracts for the purpose of retaining public agencies or private companies to perform *301 delineations of flood hazard areas. 42 U.S.C. § 4101(a). The object is to "establish flood-risk zones" with a view toward identify[ing] and publish[ing] information" as to "flood plain areas...." 42 U.S.C. § 4101(a)(1). Thus, our statutory and regulatory framework interfaces with its federal counterpart.
Returning to New Jersey's regulations, N.J.A.C. 7:13-1.2 divides flood hazard areas into two parts, called the "floodway," which is basically the stream channel and those areas immediately adjacent to the channel needed to carry away flood waters, and the flood fringe area. While we are not concerned here with nondelineated streams, we note that they have been divided in a somewhat similar manner. The floodway equivalent is "the encroachment line," ibid., and the flood fringe area is the 100-year flood plain.
Key to the present dispute is the fact that strict land use restrictions apply in the flood hazard area. In the floodway of a delineated stream and within the encroachment line of a nondelineated stream, virtually all construction of structures and addition of fill is prohibited. N.J.A.C. 7:13-3.1(a). In the flood fringe area of a delineated stream and the 100-year flood plain of a nondelineated stream, most fill activity is also prohibited. N.J.A.C. 7:13-4.7(d) limits fill and structures to 20% of the volume of net fill in such areas. In addition, construction is sharply limited. N.J.A.C. 7:13-4.7(c). In contrast, property outside the flood fringe area is not subject to any net site limitation or land use restriction under the Act or or its implementing regulations.

II.
It is against this statutory and regulatory backdrop that we examine the facts of this case which are essentially undisputed and a matter of public record. As we mentioned at the outset of our opinion, Cyanamid owns a 600 acre facility in the area of the Raritan River. The area was originally delineated in 1972 by the Division of Water Policy under the auspices of the *302 predecessor statute. L. 1962, c. 19. Apparently relying on this 1972 delineation, Cyanamid constructed a dike which bordered its facility to be higher than the flood hazard area design flood elevation. After Cyanamid built the dike, the DEP on at least three occasions over the next 16 years readopted the 1972 delineation. Each of these regulatory actions left unchanged the 1972 delineation and continued to establish the flood area design elevation to be lower than Cyanamid's dike.
On April 7, 1986, the DEP proposed to amend N.J.A.C. 7:13-7.1 to incorporate a revised delineation. 18 N.J.R. 600(a). As originally proposed, the redelineation was said by the DEP to have a "minimal social impact." Based on Cyanamid's objection to this notice, the DEP withdrew its proposal and later reintroduced it, noting that the higher flood area hazard design flood elevation would change "ranging from - .7 to + 5.5 feet" above the current theoretical level, thereby translating into "a commensurate expansion of the flood hazard area...." 19 N.J.R. 167. The redelineation proposed by the DEP was said to be occasioned by "more recent FEMA studies" and by development which enlarged areas covered by impervious surfaces. 19 N.J.R. 168. The hydraulics for the revised profiles were computed using the U.S.G.S. E-431 hydraulic computer model. This was in accord with the method used by the federal government to delineate the flood hazard areas in Franklin, Manville and Hillsborough. 19 N.J.R. 169; 20 N.J.R. 392. It was explained that the DEP does not use the U.S.G.S. model strictly in every delineation. On the contrary, the majority of streams in the State have been delineated employing the Army Corps of Engineers HEC-2 hydraulic computer model. Ibid. Other streams have been delineated based on the Soil Conservation Service's WSP-2 water surface profiles program. Ibid.
As we have noted, the DEP uses the 100-year design flood calculation developed by the federal government, but adds on 25% of the computed water volume as to delineated streams. N.J.A.C. 7:13-1.2. At the hearing on the proposed redelineation, John Scordata, the principal environmental engineer of the *303 DEP's Bureau of Flood Plain Management, explained that "[n]ormally the [25% addition] is less than one foot greater in stage or depth" and is designed to reflect "the effect of future development within the basin...." The purpose of the 25% add-on is to create a buffer to offset increases in the flood hazard area that would enlarge the size of the design flood but cannot otherwise be calculated into the 100-year storm. In using the federal flood insurance studies to delineate the flood hazard area, the DEP found that the 100-year flood plain plus the 25% add-on fell within five percent of the federal program's 500-year flood in this area. 19 N.J.R. 168. Because of the close parallel of these two calculations, the DEP utilized this established mark in delineating the flood hazard area. The DEP considered the federal government's 500-year storm to be essentially equivalent to the 100-year storm with the 25% add-on, any deviation between the two being deemed "de minimis."
Representatives of Cyanamid appeared at both public hearings on the proposed redelineation. Cyanamid additionally submitted extensive written comments. At the initial hearing, counsel for Cyanamid conceded that, although all of the data supporting the redelineation was not part of the official record, Scordata had explained to them the basis for the work performed and the results ultimately reached.
Cyanamid criticized the use of base topographical maps that were apparently 18 years old, and remonstrated the DEP for not making a field investigation to determine whether structural changes or development had caused any impact on the floodway. Cyanamid also complained, as it does here, that the DEP failed to adopt regulations establishing standardized methodologies and computer models to be employed in the delineation and redelineation processes. It was further argued that the proposed redelineation failed to identify subportions according to the relative risk of flooding, as required by N.J.S.A. 58:16A-52a. Finally, Cyanamid challenged the validity of the 25% add-on to the 100-year design flood. N.J.A.C. 7:13-4(d).
*304 Despite these objections, the amendment to N.J.A.C. 7:13-7.-1(d) was adopted on January 18, 1988. The amendment incorporates the revised map of the delineated flood hazard area. This appeal followed.

III.
We first consider Cyanamid's argument that the redelineation of the flood hazard area accomplished by the amendment to N.J.A.C. 7:13-7.1(d) must be invalidated because the technical methodology and hydraulic computer model employed constituted a de facto rule. Cyanamid contends that the DEP's delineation methodology is tantamount to an agency rule adopted in violation of the notice, publication, comment and hearing requirements of the Administrative Procedure Act. Conversely, the DEP asserts that the technology used to delineate streams, including the utilization of a computer model, does not constitute an agency rule. It also contends that those affected by a proposed delineation are fully protected because they are accorded the right to object and comment at public hearings prior to adoption of the regulation incorporating the delineation. The critical question, therefore, is whether the DEP's technology and methodology used in delineating a flood hazard area constitutes a de facto rule. We hold that it does not.
Initially, we reject Cyanamid's argument that N.J.S.A. 58:16A-52 requires the DEP to promulgate appropriate regulations encompassing delineation methodology and technology. Cyanamid's contention is belied by the plain language of the statute. By its very terms, N.J.S.A. 58:16A-52a requires the DEP to "adopt rules and regulations which delineate as flood hazard areas" those geographic zones which, in essence, pose a serious risk of frequent and dangerous flooding. Contrary to Cyanamid's assertion, the statute does not direct the DEP to promulgate regulations providing standards and procedures for accomplishing this task. Although the Act perhaps permits the *305 DEP to adopt such regulations, it does not in any sense compel that course.[1]
The question remains, however, whether the methodology and technology employed by the DEP in the delineation process are tantamount to an agency rule. Resolution of the issue requires us to consider the nature of a "rule" as it affects administrative agency policy-making and regulation. N.J.S.A. 52:14B-2(e) defines an administrative agency rule in the following terms:
`Administrative rule' or `rule,' when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.
Although this definition can be articulated with disarming ease, its application is not without difficulties.
The subject was exhaustively explored by our Supreme Court in Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313 (1984). There, the Court observed that the question had spawned much litigation. Id. at 328-331. See, e.g., Crema v. New Jersey Dept. of Environmental Protection, 94 N.J. 286 (1983); Texter v. Human Services Dept., 88 N.J. 376 (1982); Bally Mfg. Corp. v. New Jersey Casino Control Comm'n, 85 N.J. 325 (1981), app. dism. 454 U.S. 804, 102 S.Ct. 77, 70 L.Ed.2d 74 (1981); Boller Beverages, Inc. v. Davis, 38 N.J. 138 (1962). Synthesizing the existing authority, the Court stated that an administrative determination should be considered an agency rule in many or most of the following circumstances:
(1) [it] is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; *306 (2) [it] is intended to be applied generally and uniformly to all similarly situated persons; (3) [it] is designed to operate only in future cases, that is, prospectively; (4) [it] prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) [it] reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) [it] reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. [Metromedia, Inc. v. Director, Div. of Taxation, supra, 97 N.J. at 331-332].
Metromedia provides standards for determining whether rulemaking requirements apply to or govern an agency decision or particular agency action. The precise issue presented in Metromedia concerned whether an agency determination was subject to the criteria of either rulemaking or adjudication. 97 N.J. at 328, 332-333. In several more recent opinions, the Court has made it clear that Metromedia is not limited to the determination of whether a particular agency action is either rulemaking or adjudication. See Woodland Private Study Group v. State, 109 N.J. 62, 67 (1987); In the Matter of the Request For Solid Waste Utility Customer Lists, 106 N.J. 508, 517-518 (1987). See also Board of Education, City of Plainfield v. Cooperman, 209 N.J. Super. 174 (App.Div. 1986), aff'd. 105 N.J. 587 (1987); Radiological Society v. N.J. State Dept. of Health, 208 N.J. Super. 548, 558-560 (App.Div. 1986). These decisions have applied the Metromedia criteria to distinguish rulemaking not from adjudication, but from "informal action," "intra-agency statements" and "policy statements." Thus, the Metromedia standards, "although originally formulated in a context that distinguished rulemaking from adjudication, essentially provides a test of when rulemaking procedures are necessary in order to validate agency actions or determinations." Woodland Private Study Group v. State, supra, 109 N.J. at 68.
Applying the Metromedia criteria here, it is obvious that the delineation methodology and the hydraulic computer model used by the DEP have some of the characteristics of an agency *307 rule. However, as we noted in Radiological Soc. v. N.J. State Dept. of Health, supra, "we do not read our Supreme Court's opinion in Metromedia as requiring a[n] [entirely] quantitative rather than qualitative analysis of the factors listed." Id. 208 N.J. Super. at 558. In any event, we cannot fairly say that "all or most of the relevant features of administrative rules are present [in this case] and preponderate in favor of the rule-making process." Metromedia, supra, 97 N.J. at 331.
As pointed out by counsel for the DEP, the U.S.G.S. computer model used to redelineate the Raritan River and Peters Brook does not have many of the essential characteristics of a de facto rule. First, under the Act, the DEP is directed, wherever possible, to make its delineations identical to those of the federal flood insurance programs, and, to that extent, the methodology required to be utilized is controlled by statute. N.J.S.A. 58:16A-52b. Because utilization of the models employed by the federal flood insurance program is clearly and obviously inferable from the enabling statutory authorization, regulations would seem to be wholly unnecessary. We do not suggest that the DEP is totally without discretionary authority to deviate from the hydraulic model used by the federal government. However, in light of the statutory mandate requiring identical delineations of floodways, "wherever practicable," we perceive no real need to codify by regulation the computer methodology selected by the DEP.
Second, the computer model used by the DEP in making its delineations is not uniform. As we have noted, the models employed by the DEP vary because, as a general rule, the federal delineation of the floodway is the polestar, and the federal government does not use a single computer. Thus, the U.S.G.S. E-431 computer model is only applied in those instances where the federal government has contracted with that agency to perform its survey. While perhaps the DEP's selection of a computer model based solely upon its use by the federal government may appear somewhat arbitrary, this process is fairly rooted in the Act which, of course, the administrative *308 agency may not disregard or ignore. Given this situation, there does not appear to be any practical way that the DEP could adopt a uniform regulation encompassing the hydraulic computer model and methodology to be used in every instance. Rather, it would seem that a regulation selecting a particular model could foreseeably yield results that would not be consistent with those of the federal flood insurance program, thereby subverting the statutory policy set forth in N.J.S.A. 58:16A-52b. Conversely, retaining the flexibility to use one of the several federal models will presumably promote the consistency and ease of determination of delineations as sought by the Legislature.
Third, DEP's existing regulations effectively establish a framework for the delineation process. Among them, N.J.A.C. 7:13-1.2 resolves most issues of policy regarding inclusion in the flood hazard area, based on a relative degree of risk established by the theoretical 100-year storm plus 25%. That is the regulatory framework within which delineations are to be made. In contrast, the delineation process itself is limited to the narrow computation of the characteristics of the design flood and plotting its dimensions and elevational impact onto the topography of each specific area. 20 N.J.R. 392.
Finally, we are convinced that those affected by a proposed delineation are fully protected, notwithstanding the fact that the DEP's technical methodology and the hydraulic computer model used are not encompassed in a separate regulation. We have pointed out previously that N.J.S.A. 58:16A-52a directs the DEP to adopt regulations setting forth delineations of flood hazard areas. Because the actual delineations are adopted as regulations, those affected are afforded ample opportunity to object and comment at the hearings required by the Administrative Procedure Act. To that extent, Cyanamid's contention that the DEP arbitrarily decides important technical issues on each individual delineation without giving notice and the opportunity to examine the methodology employed and its policy implications is specious.
*309 We recognize the importance of affording parties affected by a proposed agency action an appropriate opportunity to participate in the process leading to the final administrative determination. See Metromedia, Inc. v. Director, Div. of Taxation, supra, 97 N.J. at 330; Bergen Pines County Hosp. v. Dept. of Human Services, 96 N.J. 456, 469 (1984). "[W]ithout published rules of procedure and substantive criteria for [the taking of the proposed action, affected parties] have been denied any meaningful opportunity for informal response...." Historic Green Springs, Inc. v. Bergland, 497 F. Supp. 839, 854 (E.D.Va. 1980). The primary purpose of the Administrative Procedure Act is to allow interested parties to present their views, without the restrictions posed by a quasi-judicial proceeding.
This much conceded, we are convinced that Cyanamid was afforded a meaningful opportunity to be heard, and fully availed itself of this right. We acknowledge that the computer model and technology used by the DEP was not placed in the actual record on adoption of the regulation. However, the data used by the U.S.G.S. is public information, since it is required to be published. See 42 U.S.C. § 4101(a). In any event, our review of the voluminous record discloses that Cyanamid's representatives were advised of the relevant data underlying the redelineation. According to their own admission, these representatives were fully apprised of the procedures used. Although the DEP would have been better advised to have included all supporting data in the record, we are satisfied that this oversight did not cause substantial prejudice. See Safeway Trails, Inc. v. Bd. of Pub. Util. Com'rs, 42 N.J. 525, 539 (1964).
Before leaving the subject, we note that the Court of Appeals for the District of Columbia Circuit has held, albeit in a different context, that a computer model used to predict leachate levels of hazardous wastes constituted a rule subject to notice and comment. McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317 (D.C. Cir.1988). The model was said to "create[] a norm with `present-day binding effect' on the rights" of interested *310 parties. Id. at 1321. That decision is distinguishable, however, because, unlike the facts here, there was no statutory direction from which selection of one of several computer models could be inferred, and the same model was apparently used in every case. In any event, as we have stressed, we are convinced that interested persons are afforded a meaningful opportunity to challenge the technical data used by the DEP at the hearings on the proposed delineation regulation. Under these circumstances, we find the McLouth decision to be unpersuasive.
In reaching our conclusion, we are mindful of the important public policies advanced by the safeguards established under the Administrative Procedure Act. We also recognize, however, that administrative agencies must possess the ability to be flexible and responsive to changing conditions. Texter v. Human Services Dep't., supra, 88 N.J. at 385. This flexibility "includes the [discretion] to select those procedures most appropriate to enable the agency to implement legislative policy." Ibid. Toward that end, "courts and commentators have encouraged hybrid agency proceedings as a way of producing more reasoned agency decisions," ibid., particularly in complex and controversial technical areas. See Mergis, "Apple v. Franklin: An Essay on Technology and Judicial Competency," 2 Yale L. & Pol'y Rev. 62 (1983); Yellin, "High Technology and the Courts: Nuclear Power and the Need for Institutional Reform", 94 Harv.L.Rev. 489 (1981). See also Diver, "Statutory Interpretation in the Administrative State," 133 U.Pa.L.Rev. 549 (1985). While this discretion is not unlimited, we defer to the choice made so long as the selection is responsive to the purpose and function of the agency. Texter v. Human Services Dept., supra, 88 N.J. at 385-386. We discern no justifiable basis to disturb the agency's determination in this case.

IV.
We next turn to Cyanamid's argument that the delineation incorporated by N.J.A.C. 7:13-7.1(d) does not comply with *311 the statutory mandate requiring the DEP to "identify the various subportions of the flood hazard area for reasonable and proper use according to relative risk...." N.J.S.A. 58:16A-52a. As noted, the term "relative risk" is defined by N.J.S.A. 58:16A-51(d) as meaning "the varying degrees of hazard to life and property in a flood hazard area which are occasioned by differences in depth and velocity of flood waters covering and flowing over it." Cyanamid forcefully argues that the statutory scheme requires the DEP to examine the topography of each individual flood hazard area and determine specific subportions amenable to reasonable and proper use without undue risk to life and property, depending upon the depth and velocity of flood waters. We disagree.
We are satisfied that the DEP effectively complied with the statute by dividing the flood hazard area into two sections, the floodway and the flood fringe area. This division is significant because different land use restrictions apply to each. As noted previously, essentially no construction or fill activity is permitted in the floodway, N.J.A.C. 7:13-3.1, while limited development and use of land is allowed in the flood fringe area. N.J.A.C. 7:13-4.1. In adopting its regulations dividing flood hazard areas into a floodway and a flood fringe area, the DEP implicitly weighed the risk of flooding against the rights of property owners in the flood plain to develop their properties as they please. Those rules reveal a balance between competing interests which necessarily meets the requirements of the statutory scheme. While it is true that the Act requires the depth and velocity of flood waters to be considered in its risk assessment, N.J.S.A. 58:16A-51(d), this does not mean that the DEP must examine the topography of each property, tract or parcel within the flood hazard area and assess the relative risks involved. Were this interpretation of the law to prevail, the amount of time required to investigate the specific risks of flooding at any point along a stream would be so great that delineations would be a practical impossibility. To set different standards for each gradation, as Cyanamid *312 urges, would create a method of operation for the flood control program which would yield unacceptable, piecemeal, and possibly inconsistent delineations. See 20 N.J.R. 391. Moreover, Cyanamid does not advance any factual argument here, and none was presented at the public hearings, that there are a number of radically different gradations in the flood hazard area which might suggest the DEP was arbitrary in its division of the flood plain into the floodway and flood fringe area.
We are obliged to construe the statute in a commonsense fashion consonant with the legislative purpose. Waterfront Com'n of N.Y. Harbor v. Mercedes-Benz, 99 N.J. 402, 414 (1985). We should "construe statutory enactments to provide a reasonable approach if we can." Sabella v. Lacey Tp., 204 N.J. Super. 55, 60 (App.Div. 1985). See also Roman v. Sharper, 53 N.J. 338, 341 (1969). Imputing to the Legislature an intent which will result in imposition of what amounts to an impossible burden on an administrative agency is not consonant with reason. Sabella v. Lacey Tp., supra, 204 N.J. Super. at 60. See also Restaurant Enterprises, Inc. v. Sussex Mutual Ins. Co., 52 N.J. 73, 77 (1968).
So posited, a reasonable interpretation of what the Legislature intended is that the DEP was to balance risk against the right to develop on a programatic basis. By dividing a flood hazard area into the floodway, not amenable to development because of the consequent risk to life and property, and the flood fringe area, subject to limited construction and fill activity, the DEP accomplished its assigned task. In reaching this conclusion, we give deference to the agency's interpretation of the statute it is charged with enforcing. See Matter of Board of Educ. of Town of Boonton, 99 N.J. 523, 534 (1984), cert. den. 475 U.S. 1072, 106 S.Ct. 1388, 89 L.Ed.2d 613 (1986). While the DEP's interpretation of N.J.S.A. 58:16A-52a is not binding on us, see, e.g., Smith v. Director, Div. of Taxation, 108 N.J. 19, 26 (1987); Airwork Serv. Div. v. Director, Div. of Taxation, 97 N.J. 290, 296 (1984); Service Armament Co. v. Hyland, 70 N.J. *313 550, 563 (1976), it "is entitled to substantial weight." Matter of Board of Educ. of Town of Boonton, supra, 99 N.J. at 534. Based upon our research and the record before us, we are convinced that the DEP's construction of the Act is entirely reasonable, and we interpret the statute accordingly.

V.
Cyanamid next contends that the DEP failed to faithfully apply its own regulations. Specifically, it is argued that the DEP incorrectly used the 500-year storm plain rather than the 100-year storm plus the 25% add-on in determining the flood hazard area design flood as required by N.J.A.C. 7:13-1.2. We reject this contention.
As we pointed out previously, the 500-year flood was used in the federal flood insurance studies of the area surrounding Bridgewater. The record discloses that "[t]he 100-year and 500-year discharges were reviewed for consistency along the Raritan River and the State flood hazard area design discharges were computed to be within five percent of the 500-year discharges" used in the federal flood insurance studies. 20 N.J.R. 392. This does not mean that the DEP deviated from N.J.A.C. 7:13-1.2. The DEP still based its flood hazard area delineation on the 100-year flood discharges plus 25%. It utilized the U.S.G.S. 500-year design flood line only after it determined that the difference between the 100-year storm, with the 25% add-on, and the 500-year flood line was de minimis, and that it would be more consistent for identification purposes to use the 500-year flood design discharge. The result reached by the DEP comports with the requirement that its delineations, wherever practicable, are to be identical to the floodway delineations approved by the federal government. See N.J.S.A. 58:16A-52b. We perceive no abuse of authority in this regard.

*314 VI.
Equally unpersuasive are the remaining arguments advanced by Cyanamid. More specifically, we find no merit in Cyanamid's claim that (1) the definition of "flood hazard design flood" contained in N.J.A.C. 7:13-1.2 is invalid because the 25% add-on to the 100-year storm has no logical support, (2) the 20% net fill requirement provided by N.J.A.C. 7:13-4.7(d)(1) is arbitrary and capricious and (3) the different treatment given to delineated and nondelineated areas is irrational and violates equal protection. R. 2:11-3(e)(1)(E).
Preliminarily, we harbor serious reservations as to whether these issues have been properly raised in these proceedings. The proposal to amend N.J.A.C. 7:13-7.1(d) which appeared in 18 N.J.R. 600(a) and 19 N.J.R. 167(b) announced only that the DEP would be accepting and considering public comments on proposed revision of the maps detailing flood hazard areas. As we have mentioned, the sole purpose of the proposed amendment was to revise these maps to reflect updated hydrogeological data. Since only the delineation, and none of the definitional or regulatory provisions of the rules, was subject to amendment pursuant to the proposal, the other arguments Cyanamid sought to advance were not considered to be appropriate subjects for comment.
It seems obvious that it would be a gross perversion of settled principles of administrative law to require an agency to totally recreate, on a proceeding to amend a single regulation, a record that is supportive of all other rules that might possibly interact with the proposed change. See N.J.S.A. 52:14B-4. We tend to agree with the DEP's position that the amendment of a regulation does not open to attack other, somewhat related regulations which are not proposed to be changed.
In the context of this case, the entirety of the Flood Hazard Area Control regulations was not under consideration and the DEP was under no obligation to present factual information in support of rules it had adopted in prior years. Our *315 conclusion is not predicated on the 45-day appeal limit pertaining to administrative adjudications. See Atlantic City Casino Hotel v. Casino Control Com'n, 203 N.J. Super. 230, 239 (App.Div. 1985); Pressler, Current N.J.Court Rules, Comment R. 2:4-1(b) (1988). It rests instead upon the dictates of orderly practice and the doctrine of exhaustion of administrative remedies, the latter principle being applicable because Cyanamid could have, but did not, formally challenge the other regulations, and the issues presented involve mixed questions of fact and law. See Cumberland Farms, Inc. v. Moffett, 218 N.J. Super. 331, 342 (App.Div. 1987); N.J.S.A. 52:14B-4.
We need not dwell upon the subject, however. The simple and overriding fact is that Cyanamid has advanced nothing to support its contention that the regulations it challenges are invalid. In reviewing a regulation to determine the sufficiency of its factual basis, "[the] facts sufficient to justify the [rule] must be presumed." Consolidation Coal Co., et al. v. Kandle, et al., 105 N.J. Super. 104, 114 (App.Div. 1969), aff'd o.b. 54 N.J. 11 (1969). See also Bergen Pines Hosp. v. Dept. of Human Services, supra, 96 N.J. at 477; In re Promulgation of Rules of Practice, 132 N.J. Super. 45, 499 (App.Div. 1974), certif. den. 67 N.J. 95 (1975). The burden is on the party challenging the regulation to show that it is without justification. Consolidation Coal Co., et al. v. Kandle, et al., supra, 105 N.J. Super. at 114.
Based upon our review of the record, Cyanamid has utterly failed to satisfy its burden in this case. First, we perceive ample support in the record that the 25% add-on is reasonable, because it provides an appropriate safety buffer for unanticipated development. Second, the 20% net fill requirement was upheld by us in Society for E.E.D. v. New Jersey D.E.P., 208 N.J. Super. 1. (App.Div. 1985). There, we said that the "record persuade[d] us that the 20% net fill rule is based both on reputable, technical opinion and represents a reasonable compromise between those groups opposing any *316 development in flood hazard areas at all and those desiring maximum development[al] opportunities." Id. at 5. We find no reason to depart from our holding in that case. Third, we perceive no irrationality in the distinction between delineated and nondelineated streams. The record, although somewhat scanty in this respect, supports the policy determination of the DEP to delineate streams having the greatest velocity and thus posing the highest corresponding risk. There is nothing illogical in that approach. See Exxon Co., U.S.A. v. Livingston Tp. in Essex Cty., 199 N.J. Super. 470, 477 (App.Div. 1985).

VII.
The problems that complex technical cases such as this pose for reviewing courts have been widely discussed. See, State of Ohio v. United States E.P.A., 784 F.2d 224, 230 (6th Cir.1986), aff'd. 798 F.2d 880 (6th Cir.1986). In that context, we would be remiss were we to fail to note the excellent quality of the briefs submitted by counsel for both parties. We appreciate their efforts.
Affirmed.
NOTES
[1] We thus need not address whether in the absence of a statute an agency's decision to employ a particular computer model to fulfill its delegated responsibilities in another setting requires adherence to the Administrative Procedure Act. Cf. McLouth Steel Products Corp. v. Thomas, 838 F.2d 1317 (D.C. Cir.1988).