793 A.2d 847

MERCER COUNTY DEER ALLIANCE, NEW JERSEY ANIMAL RIGHTS ALLIANCE, ANIMAL PROTECTION INSTITUTE, URSA CURAC, DEBRA FAIELLO, MARILYN JOHNSON, AND LINDA NIEDWESKE, APPELLANTS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DIVISION OF FISH, GAME AND WILDLIFE, AND NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DIVISION OF FISH, GAME AND WILDLIFE, FISH AND GAME COUNCIL, RESPONDENTS.

MILLBURN–SHORT HILLS HUMANE ALTERNATIVES (MSH–HALT), PAT PORTER AND LARAINE BARACH, APPELLANTS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PRO-TECTION, DIVISION OF FISH, GAME & WILDLIFE AND NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DIVISION OF FISH, GAME & WILDLIFE, FISH & GAME COUNCIL, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted March 12, 2002—Decided April 1, 2002.

442

Before Judges PRESSLER, CIANCIA and PARRILLO.

*Skey, Dumont & Matejek,* attorneys for appellants in A–4134–98T2 (*Nielsen V. Lewis* and *Denise H. Feder,* on the brief).

*William Strazza,* attorney for appellants in A–1618–00T2.

*David Samson,* Attorney General, attorney for respondents (*Michael J. Haas,* Assistant Attorney General, of counsel; *Jose L. Fernandez,* Deputy Attorney General, on the briefs).

*Mason, Griffin & Pierson,* attorneys for *amicus curiae* Township of Princeton (*Trishka Waterbury* and *Lisa Randazzese,* on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

These appeals arise out of the deer control mechanisms promulgated by the Legislature and, pursuant to asserted legislative authority, by the Division of Fish, Game and Wildlife in the Department of Environmental Protection (Division) and by the Fish and Game Council, an arm of the Division. In the appeal filed under Docket Number A–4134–98T2, a variety of challenges to the program and its implementation have been brought by a group of animal-rights organizations, including Mercer County Deer Alliance, New Jersey Animal Rights Alliance, Animal Protection Institute as well as several individuals (collectively Mercer County appellants). These challenges are based in part on the regulatory process in place prior to June 30, 2000, the effective date of *N.J.S.A.* 23:4–42.3 to–42.8 (the Act), enacted by *L.* 2000, *c.* 46, which comprehensively addresses deer management. The Mercer County appellants also challenge the constitutionality of the Act. In the appeal filed under Docket Number A–1618–00T2, Millburn–Short Hills Humane Alternatives, another animal rights group, and several of its members (collectively Millburn appellants) challenge the constitutionality, both facially and as applied, of the Act. We calendared the two appeals back to back, and we now consolidate them for purposes of this opinion.

Our review of the record in each of the appeals satisfies us that the issues raised in respect of the regulatory program and its implementation prior to the 2000 adoption of the Act have been essentially rendered moot by the Act. We are also satisfied that there is no constitutional infirmity, either facial or as applied,

inherent in the Act or regulation. We therefore dismiss the appeal under Docket Number A–4134–98T2, the Mercer County appeal, to the extent it raises pre–2000 issues, and we reject the claims of unconstitutionality raised in both appeals.

A brief historical context is necessary. The Division of Fish, Game and Wildlife is constituted by *N.J.S.A.* 13:1B–23 as an agency within the Department of Environmental Protection and Energy (DEPE).[1] The eleven-member Fish and Game Council, representing designated interests and appointed by the Governor with the advice and consent of the Senate, was established by *N.J.S.A.* 13:1B–24 as an arm of the Division. The Council's general statutory mission is, subject to the Commissioner's approval, to "formulate comprehensive policies for the protection and propagation of fish, birds, and game animals...." *N.J.S.A.* 13:1B–28. In performing this mission, it is directed to consult with and advise the Director of the Division, to study the activities of the Division, to hold such hearings as it deems advisable, and to report at least annually to the Governor and Legislature. More specifically, the Council is charged by *N.J.S.A.* 13:1B–30 with developing and promulgating a State-wide Fish and Game Code. The purpose of the Code is to provide "an adequate and flexible system of protection, propagation, increase, control and conservation of fresh water fish, game birds, game animals, and fur-bearing animals," including regulations for pursuing, taking and killing. The Code is, moreover, required to be based on "scientific investigation and research." *Ibid.*

Prior to 1994, the Division and the Council had become deeply concerned about the white-tailed deer population in the State, having reason to believe that the extent of overpopulation was not only threatening the viability of the deer herds but was also causing significant problems in terms of crop and garden damage

---

[1] The historical note appended to *N.J.S.A.* 13:1B–23 traces the evolution of the title of the Division from its original title, Division of Fish and Game, as well as its reallocation from the Department of Conservation and Economic Development to the DEPE.

and vehicular accidents. On January 20, 1994, the Division promulgated a detailed policy statement entitled Community Based Plan For The Management of Suburban Deer Population–Policy and Program (the State CBDMP or State Plan). Relying at least in part on sixteen referenced studies, the program was predicated on the theory of deer population capacity, taking into account two capacity criteria, namely, biological carrying capacity, defined as the maximum number of deer that a given area can support in good health over an extended period, and cultural carrying capacity, defined as that number of deer that can coexist compatibly with the local human population in a given area and measured by the extent of crop and garden degradation and vehicular accidents caused by deer. The purpose of the State Plan, addressed to the control of urban, suburban and other "unhuntable" deer populations, was stated as

... to provide a cooperative approach to controlling deer populations which have exceeded or have the potential to exceed either the cultural or biological carrying capacity of suburban environments and to reestablish where possible traditional or controlled hunting programs as one of several potential means of achieving control as quickly and efficiently as possible.

The goals of the State Plan included:

1. To develop and maintain a healthy and productive deer resource at or below the biological carrying capacity of the habitat.

2. To maintain local deer populations at densities which are compatible with human activities and uses of the land-the cultural carrying capacity.

3. To maximize and preserve the recreational, economic, social/cultural, scientific and esthetic values of the deer resource.

The scheme of the State Plan was, essentially, to place the burden of initiating action on a federal or local authority or entity, termed a cooperator, that was experiencing deer overpopulation problems. The cooperator was required to request, in writing, assistance from the Division. The Division was then authorized to make an initial determination that assistance was warranted, and if so, to then make an independent evaluation of the necessity of a local deer control management program. If the necessity for control was verified, the Division and the cooperator would enter into a memorandum of understanding (MOU) and cooperate in the formulation of an appropriate management plan, the local CBDMP

(community plan), to be approved by the Division. If the community plan included killing or capturing deer, a special Division permit would be required. From the time of execution of the MOU until final implementation of the community plan, the Division would be obliged to monitor the activities of the cooperator and to lend it assistance. The State Plan provided as well for the holding of public hearings by the cooperator on the community plan.

The State CBDMP did not become the subject of a formally adopted regulation until 1995, when the Division promulgated *N.J.A.C.* 7:25–5.32, dealing generally with special wildlife management permits. Section (d) of that regulation deals specifically with deer management and encompasses, with particularity, the general scheme of the 1994 State CBDMP. The State CBDMP itself was updated in 1998, and two years later the Act, *N.J.S.A.* 23:4–42.3 to –42.8, was adopted. The Act, which we will refer to again hereafter, is a comprehensive statute reformulating the essential scheme of the original 1994 State Plan. It requires approval of an application by a locality for designation of a special deer management area. *N.J.S.A.* 23:4–42.3a. It requires preparation of a community based deer management plan, the community plan, required to be reviewed, approved, and then monitored by the Division. *Ibid.* It provides a detailed statement of the information required to be set forth in the application for approval. *N.J.S.A.* 23:4–42.3b. It provides for the issuance of a permit for implementation of the community plan including statutory exemptions. *N.J.S.A.* 23:4–42.5 to –42.6. The Act also establishes a venison donation program that would provide food to non-profit charitable organizations if the community plan included a killing permit. *N.J.S.A.* 23:4–42.7. Finally, in August 2001, the regulation, *N.J.A.C.* 7:25–5.32, was comprehensively revised for, among other purposes, prescribing substantially greater specificity in the community based plan application and prescribing more stringent community notice requirements.

We consider the two appeals before us against this statutory and regulatory background. We begin with the Mercer County appeal. Appellants first challenge the validity of the 1994 State Plan. They urge that adoption of the State Plan by way of a policy statement was ineffective since the standards prescribed by *Metromedia, Inc. v. Dir., Div. of Taxation,* 97 *N.J.* 313, 331–332, 478 *A.*2d 742 (1984), required the substance and the content of the State Plan to have been promulgated by regulation duly adopted in accord with the procedures mandated by the Administrative Procedure Act (APA), *N.J.S.A.* 52:14B–1, *et seq.* We regard the issue as moot in view of the subsequent adoption and revisions of *N.J.A.C.* 7:25–5.32 and the later adoption of *N.J.S.A.* 23:4–42.3 to–42.8. It is well settled that a defect in original promulgation is cured by subsequent adoption of a conforming regulation in compliance with the APA. *See, e.g., In re Madin/Lord Land Dev. Int'l,* 103 *N.J.* 689, 695, 512 *A.*2d 490 (1986); *Hampton v. Dep't of Corr.,* 336 *N.J.Super.* 520, 530–531, 765 *A.*2d 286 (App.Div.2001); *Walker v. Dep't of Corr.,* 324 *N.J.Super.* 109, 113, 734 *A.*2d 795 (App.Div. 1999); *Blyther v. N.J. Dep't of Corr.,* 322 *N.J.Super.* 56, 64, 730 *A.*2d 396 (App.Div.), *certif. denied,* 162 *N.J.* 196, 743 *A.*2d 848 (1999); *In re Producer Assignment Program,* 261 *N.J.Super.* 292, 302–303, 618 *A.*2d 894 (App.Div.), *certif. denied,* 133 *N.J.* 438, 627 *A.*2d 1144 (1993). We have compared the 1994 State CBDMP and its 1998 update with *N.J.A.C.* 7:25–5.31. The definitions, procedures and basic scheme for deer management area designation, community based deer management plan approval, special deer management permit, and Division monitoring are sufficiently common to all to render the regulation a comprehensive codification of the original State Plan. Even more significantly, the basic approach to deer management implemented by the State Plan and the regulation have been confirmed and restated in the 2000 Act. We see no reason in law or logic why that confirmation would not have related back to the regulation so long as the Division and the Council remained satisfied that the regulation continued to implement the new grant of legislative authority and the new legislative prescriptions. The fact, however, is that the regulation was

substantially revised effective August 2001, for, among other purposes, the more detailed delineation of the required contents of the application for approval of a community based plan and the inclusion of more specific community notice requirements. There is thus no procedural irregularity at all in the regulatory process.

Appellants' further challenges to the State Plan as codified by the regulation and the 2000 statute require little comment. We reject the contention that the State Plan was adopted without sufficient scientific research and investigation as required by *N.J.S.A.* 13:1B–30. That simply is not so. While there may be some scientific dispute as to the utility of standards based on biological and cultural carrying capacities as well as dispute as to the specific content of the standards, the fact remains, as this record demonstrates, that there is a wealth of respectable professional and scientific literature supporting the determinations represented by the Plan. It was clearly within the discretion of the Division and the Council to evaluate the available scientific literature and professional opinion and to determine which of various theories and approaches to adopt. *See United Hunters Ass'n of N.J., Inc. v. Adams,* 36 *N.J.* 288, 292, 177 *A.2d* 33 (1962).

■ We also reject as without merit appellants' claim that the State Plan exceeds statutory authority by permitting the killing of deer overpopulations even in accordance with the strict conditions of issued permits. *N.J.S.A.* 13:1B–30 states as among the purposes of the Fish and Game Code, of which *N.J.A.C.* 7:25–5.32(d) is a part, the protection and control of wildlife. There is nothing we can perceive in the statute that interdicts carefully circumscribed and conditioned killing as a method of control. Moreover, there is adequate support in this record for the proposition that overpopulation threatens the viability of the deer population as a whole and hence that protection of that population will be advanced by its reduction. Most significantly, *N.J.S.A.* 13:1B–30 expressly authorizes the Council, in its promulgation of the Fish and Game Code, "to determine under what circumstances, when and in what localities, by what means and in what amounts and

numbers ... game animals ... may be pursued, taken, killed, or had in possession...." Provision for the issuance of special killing permits under the strictures of the regulation for the purpose of deer overpopulation control is, in our view, patently and expressly within the legislative grant of authority. In any event, however, that issue is mooted as well by the 2000 Act, which expressly provides for killing by special permit and thus, at least prospectively, obviates any possible defect based on the Code's alleged exceeding of legislative authority.

Nor do we find merit in appellants' contention that the State Plan and regulation are flawed by reason of the role accorded to the cooperators, a role appellants characterize as an unlawful and *ultra vires* delegation of authority. That role has now been confirmed by the 2000 Act, and there is no argument, nor could there be a valid argument, that the Legislature was without power to devise a scheme of community initiated and executed deer management plans subject to review, approval and monitoring by the Division.

■ Before addressing the challenges made by both Mercer County and Millburn to the 2000 Act, there is one further point raised by the Mercer County appellants to be considered. They challenge the makeup of the Council prescribed by *N.J.S.A.* 13:1B–24, namely three farmers recommended by the agricultural convention, six sportsmen recommended by the New Jersey State Federation of Sportsmen's Clubs, the chairman of the committee established under the Endangered and Nongame Species Conservation Act, and one member knowledgeable in land use management and soil conservation practices. Although the statutorily prescribed Council makeup was then somewhat different, we are satisfied that the Supreme Court's approval of the basic representative design for Council membership applies here. We deem the issue settled by *Humane Soc'y of U.S. v. N.J. State Fish and Game Council,* 70 *N.J.* 565, 362 *A.*2d 20 (1976). We are bound by that holding.

We consider now the constitutional challenges to the 2000 Act. In this regard, we point out that insofar as the record shows, there are no outstanding permits-all permits issued that underlie these appeals have expired. Thus, arguments addressed specifically to previously issued permits are moot. All that we regard, therefore, as now before us are the 2000 Act and the 2001 revised regulation, and our concern is whether they provide a constitutional framework for future program approval and implementation.

Appellants challenge the Act as an unconstitutional delegation of legislative authority in that neither the Act nor the regulations provide sufficient standards for the Division's review and approval of a community based deer management application. We agree that the constitutionality of a delegation of power to an administrative agency requires that the agency's discretion be "hemmed in by standards sufficiently definitive to guide its exercise. . . ." *Mount Laurel Tp. v. Pub. Advocate of N.J.*, 83 *N.J.* 522, 532, 416 *A.*2d 886 (1980) (quoting *Cammarata v. Essex County Park Comm'n*, 26 *N.J.* 404, 410, 140 *A.*2d 397 (1958)). *See also Ward v. Scott*, 11 *N.J.* 117, 122–123, 93 *A.*2d 385 (1952). But as we view the Act and the revised implementing regulation, adequate standards are provided for at every stage.

Illustratively, with respect to the initial administrative determination that the cooperator is in need of a deer management control program, the statutory standard is "that the deer population has caused significant damage to property . . . or has caused a significant number of vehicle collisions." *N.J.S.A.* 23:4–42.3b. Appellants argue that "significant" is too vague a standard. We disagree. A broad and general standard is an acceptable guide for the exercise of administrative discretion if the Legislature, in the enabling statute, has clearly articulated its purposes and public policies and has thereby provided in the statutory scheme itself an instructional guide to the basic method of their achievement, leaving the detailed implementation thereof to administrative expertise. *See, e.g., Keyes Martin & Co. v. Dir., Div. of Purchase*, 99 *N.J.* 244, 254–255, 491 *A.*2d 1236 (1985); *Mount*

*Laurel Tp., supra,* 83 *N.J.* at 532–533, 416 *A.*2d 886; *N.J. Bell Tel. Co. v. Communications Workers,* 5 *N.J.* 354, 371, 75 *A.*2d 721 (1950); *In re Pipes,* 329 *N.J.Super.* 391, 396, 748 *A.*2d 118 (App.Div.2000). In such circumstances, it is the statute as a whole that gives adequate substantive content to the standard. We note, further, that the revised regulation requires the cooperator's application for designation as a special deer management area to "contain a quantitative description of the significant damage caused by deer to agricultural crops or property, or the number of deer-vehicle collisions within the proposed special deer management area." *N.J.A.C.* 7:25–5.32(d)2. We are satisfied that the Legislature properly reposed in the Division the discretion to evaluate, within the context of the purpose and policy of the statute, whether the damage so described and quantified is "significant."

While no other alleged lack of standard is specifically pointed to by appellants, our review of the revised regulation and the statute it implements demonstrates a carefully circumscribed and criteria-bound process in the application procedure, the community plan contents and approval, and the community plan execution. We perceive, therefore, no constitutional infirmity in this legislative scheme.

■ Appellants also challenge *N.J.S.A.* 23:4–42.5, which permits the Council to grant an exemption or variation from specifically designated provisions of relevant statutes, rules or regulations, "to the extent necessary and appropriate to implement the alternative control methods set forth in an approved community based deer management plan." *N.J.S.A.* 23:4–42.5a conditions the exemption or variance authorization on the Council's determination that the community based deer management plan that requires it "adequately provides for the safety of the public," and permits the Council to impose conditions on the exemption or variance to ensure public safety. *N.J.S.A.* 23:4–42.5c requires written approval of the county prosecutor of any exemption or variation sought and permits the council to first require documentation that the

individuals involved in the program have the appropriate certificates and permits. The Council may also condition the exemption or variation on road or highway closings by law enforcement officers where necessary for public safety.

We are satisfied that in light of the statutory standards and conditions for the grant of a variation or exemption, that authority is no different in concept or operation from the variance power typically accorded by statute in the land-use planning context. Moreover, we further note that the sole purpose of the variation or exemption is the implementation of the community based plan, which has been thoroughly reviewed and approved at the time the exemption or variation is considered by the Council. Indeed, contrary to the typical land-use application in which the variance requested is unilaterally inspired by the applicant, here the Division is cooperatively involved from the outset in the formulation of the community plan requiring the exemption or variation.

■ Finally, we address appellants' argument respecting the Division's failure to have made findings of fact and conclusions of law in approving either the applications for designation as a special deer management area or the applications for community plan approval. Since, as we have noted, the permits granted here have expired, that issue as to those permits is moot. Nevertheless, as the issue will undoubtedly arise again, we have elected to address it.

■ *N.J.S.A.* 23:4–42.4c provides that:

> The division shall promptly review a community based deer management plan submitted pursuant to this act, and either approve the plan, approve the plan subject to modification, or disapprove the plan and return it to the applicant setting forth in writing the reasons for its decision. If the division approves a community based deer management plan, the division shall submit it to the Fish and Game Council for its review and action pursuant to section 3 [*N.J.S.A.* 23:4–42.5] of this act.

The statutory requirement for a statement of reasons is thus explicitly provided for only when the community plan is disapproved. Nor is there any statutory requirement for a statement of reasons for approving an application pursuant to *N.J.S.A.* 23:4–

42.3 for designation as a special deer management area. We are, however, satisfied that statements of reasons for approval of each of the two applications must be required. There can be no question but that review of those applications is a quasi-judicial function. And it is virtually axiomatic that findings of fact and conclusions of law are essential not only to inform interested parties of the basis of decision but also to permit appellate determination of whether the administrative action meets the test of being neither arbitrary, capricious, nor unreasonable and having properly comported with the legislative mandate. *See, e.g., Van Dalen v. Washington Tp.,* 120 *N.J.* 234, 244, 576 *A.2d* 819 (1990); *In re Howard Sav. Inst.,* 32 *N.J.* 29, 52, 159 *A.2d* 113 (1960).

The dispositive factor in approving applications for designation as a special deer management area is the Division's determination that "significant damage to property or ... significant vehicle collisions [have] been caused by an overpopulation of deer in the area described in the application." *N.J.S.A.* 23:4–42.3b. The Division, in approving an application, should state the facts upon which it bases its conclusion of significant property damage or vehicle collisions and the reasons why those facts meet the statutory standard of significant. By the same token, when it approves a community plan, it must give a reasoned statement supporting its conclusion as to why the alternative control methods on which that plan is based meet the statutory criteria purposes and policies. We are, however, satisfied that once the plan is approved, that approval, *ipso facto,* establishes sufficient reason for the grant of an exemption or variation pursuant to *N.J.S.A.* 23:4–42.5 and the issuance of the implementing permit pursuant to *N.J.S.A.* 23:4–42.6.

We uphold the validity of *N.J.S.A.* 23:4–42.3 to –42.8 and the implementing regulation, *N.J.A.C.* 7:25–5.32, as revised effective August 20, 2001, subject to the prospective requirement that the Division of Fish, Game and Wildlife issue a statement of reasons for its approval of an application for designation as a special deer

management area and its approval of a local community based deer management plan. We dismiss as moot all challenges to administrative action preceding the adoption of *N.J.S.A.* 23:4–42.3 to –42.8 and to all expired permits.