34 A.3d 784

ANIMAL PROTECTION LEAGUE OF NEW JERSEY, THE BEAR EDUCATION AND RESOURCE GROUP, THERESA FRITZGES, AND ANGELA METLER, PETITIONERS–APPELLANTS, v. NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION ("NJDEP"), BOB MARTIN, IN HIS CAPACITY AS COMMISSIONER OF THE NJDEP, DIVISION OF FISH & WILDLIFE, DAVID CHANDA, IN HIS CAPACITY AS DIRECTOR OF THE DIVISION, NJDEP, DIVISION OF FISH & WILDLIFE, FISH & GAME COUNCIL, AND JEANETTE VREELAND, IN HER CAPACITY AS CHAIR OF THE COUNCIL, RESPONDENTS–RESPONDENTS.

SAFARI CLUB INTERNATIONAL AND SAFARI
CLUB INTERNATIONAL FOUNDATION,
INTERVENORS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 29, 2011—Decided December 1, 2011.

550

Before Judges CARCHMAN, FISHER and NUGENT.

*Doris Lin* argued the cause for appellants.

*Dean Jablonski,* Deputy Attorney General, argued the cause for respondent New Jersey Department of Environmental Protection

(*Paula T. Dow*, Attorney General, attorney; *Nancy Kaplen*, Assistant Attorney General, of counsel; *Mr. Jablonski, Jacqueline M. Quick* and *Caroline P. Keefe*, Deputy Attorneys General, on the brief).

*Anna M. Seidman* of the D.C. bar, admitted pro hac vice, argued the cause for respondents Safari Club International and Safari Club International Foundation (*John C. Lane*, attorneys; *Ms. Seidman* and *Douglas S. Burdin* of the D.C. bar, admitted pro hac vice, and *Peter Caccamo–Bobchin*, on the brief).

The opinion of the court was delivered by

CARCHMAN, P.J.A.D.

This appeal challenges the validity of the Comprehensive Black Bear Management Policy (CBBMP) adopted by respondent New Jersey Department of Environmental Protection (NJDEP, DEP or Department).[1] The issues raised in this appeal were previously addressed, in part, by appellants Animal Protection League of New Jersey, the Bear Education and Resource Group, Theresa Fritzges and Angela Metler on an unsuccessful, prior application to stay the 2010 bear hunt. *See Animal Prot. League of N.J. v. N.J. Dep't of Envtl. Prot.*, No. A–1603–10, Motion No. M–1925–10, 2010 *WL* 4910258 (App.Div. December 3, 2010). On this appeal, addressing the merits of the CBBMP, appellants raise myriad issues as to the validity of CBBMP; however, the nidus of their argument is that respondents acted arbitrarily and capriciously in adopting the CBBMP. While there may be disagreements as to available data and its interpretation, under our standard of review we defer to agency findings that are based on sufficient evidence in the record. We conclude that the agency findings here meet

---

[1] Other named respondents included Bob Martin, Commissioner of the DEP; the Division of Fish and Wildlife (Division or DFW); David Chanda, Director of the DFW; the DFW Fish & Game Council (Council); and Jeanette Vreeland, Chair of the Council. Intervenors include the New Jersey Federation of Sportsman's Clubs, Inc., the Safari Club International, and Safari Club International Foundation.

that standard. Most important, we conclude that appellants have failed to demonstrate that respondents acted arbitrarily or capriciously or in bad faith. We further conclude that appellants have failed to demonstrate any procedural deficiencies supporting invalidation of the CBBMP. Accordingly, we affirm.

I.

Respondent Council exists within the DFW, a division of the NJDEP. *N.J.S.A.* 13:1B–24. *See also U.S. Sportsmen's Alliance Found. v. N.J. Dep't of Envtl. Prot.,* 182 *N.J.* 461, 473, 867 *A.*2d 1147 (2005). The Council is responsible for "formulat[ing] comprehensive policies for the protection and propagation of fish, birds, and game animals...." *N.J.S.A.* 13:1B–28. The Council is authorized to adopt appropriate and reasonable regulations regarding the circumstances under which game animals may be "pursued, taken, killed, or had in possession" for the purpose of "providing an adequate and flexible system of protection, propagation, increase, control and conservation" of such animals, "and for their use and development for public recreation and food supply...." *N.J.S.A.* 13:1B–30. The Council may do so only "after first having determined the need for such action on the basis of scientific investigation and research...." *N.J.S.A.* 13:1B–30.

In 2010, pursuant to the enabling legislation and statutory authorization, respondents developed the CBBMP. *See* 42 *N.J.R.* 753(a). The proposed CBBMP recommended, among other things, the reintroduction of a regulated black bear hunt, to take place annually in December. 42 *N.J.R.* 764–65. Other issues addressed by the proposed CBBMP include: education; control of human-derived food; research and analysis of the State's black bear population; analysis of the State's available black bear habitat; cooperative research with other states, academic institutions and other entities engaged in research on black bear management; lethal and non-lethal means of controlling bears to reduce the nuisances they create and their threat to human safety,

agricultural crops and property; habitat protection; and bear population management. 42 *N.J.R.* 753(a).

In the CBBMP, the Council stated that it supported "active, integrated bear management and [the Division's] population goal of maintaining bears at a density that provides for a sustainable population within suitable bear habitat, minimizes human-bear conflicts and reduces emigration of bears to unsuitable habitat in suburban and urban areas." 42 *N.J.R.* 765. It recommended that the Division "continue its integrated strategy for black bear management," including the implementation of a regulated black bear hunting season. 42 *N.J.R.* 765. The details of this hunt were described in the CBBMP and included the adjustment of permit quotas and season length "as necessary to regulate hunting pressure," as well as the establishment of a bear permit fee. 42 *N.J.R.* 764–65. The CBBMP further advised that respondents "develop a long-term structure for bear hunting seasons to reduce and then stabilize the bear population at a level compatible with the availability and quality of habitat, which is consistent with public safety and residential and agricultural concerns." 42 *N.J.R.* 765.

The Council approved the proposed CBBMP on March 9, 2010, which DEP Commissioner Martin then approved on March 17, 2010. *Animal Prot. League of N.J. v. N.J. Dep't of Envtl. Prot.*, No. A–1603–10, Motion No. M–1925–10 (App.Div. December 3, 2010) (slip op. at 6), 2010 *WL* 4910258.[2] On April 19, 2010, respondents published the proposed CBBMP in the New Jersey Register. *See* 42 *N.J.R.* 753(a). On May 11, 2010, respondents held a public hearing on the proposed CBBMP. Respondents also accepted written and online comments from the public until June 18, 2010. *Animal Prot. League, supra,* No. A–1603–10, slip op. at

---

[2] Although this opinion is unreported and not cited as precedent, *R.* 1:36–3, it is useful for the limited purpose of presenting relevant but general background and history. *See* Pressler & Verniero, *Current N.J. Court Rules,* comment 2 on *R.* 1:36–3 (2011).

6–7. During the public comment period, over 9000 comments were submitted.

In July 2010, the Council and Commissioner Martin approved the CBBMP. *Id.* at 7. Respondents published the final adopted version of the CBBMP in the New Jersey Register on November 15, 2010. *See* 42 *N.J.R.* 2754(c).

On November 17, 2010, appellants requested that respondents stay the 2010 bear hunt pending this appeal. Respondents refused.

Appellants appealed respondents' adoption of the CBBMP and moved for a stay of the 2010 bear hunt, scheduled to commence on December 6, 2010. *Animal Prot. League, supra,* No. A–1603–10, slip op. at 7. On December 3, 2010, in an unpublished opinion, we denied the motion for stay. *Id.* at 18. The New Jersey Supreme Court thereafter denied a similar motion. We now address the merits of the appeal.

## II.

Appellants argue that respondents acted arbitrarily and capriciously when they, "[i]n an apparent effort to both provide recreational hunting and deflect public opposition to a purely recreational hunt, ... distorted, misstated, and made up data in support of a policy that represents to the general public, falsely, that the proposed black bear hunt is a matter of scientific necessity." [3] Appellants raise a number of specific acts by respondents to

---

[3] Appellants also claim that decisions by the Council regarding the institution of a bear hunt are naturally suspect because the statutorily mandated makeup of the Council requires that "six of the eleven [Council] members ... be hunters," *see N.J.S.A.* 13:1B–24, creating a conflict of interest, or at least "an inherent tension." In concluding that the Council's makeup passes constitutional muster, the Court has stated that:

[L]ogic is not offended by the classes included in the challenged statute. We have already stressed the discrete character of the ... Council, charged as it is with certain responsibilities and powers pertinent to ensuring the statutory objective of an abundant supply of game for recreational and commercial

demonstrate that respondents acted arbitrarily and capriciously. Both respondents and intervenors argue that respondents did not act arbitrarily or capriciously and that this court should defer to respondents' expertise in bear management.

### A.

We first address our standard of review. We will not overturn an administrative action "in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence." *In re Carter*, 191 *N.J.* 474, 482, 924 *A.*2d 525 (2007) (quoting *Campbell v. Dep't of Civil Serv.*, 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963)). Our role in reviewing agency action is generally limited to determining:

(1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.

[*Thurber v. City of Burlington*, 191 *N.J.* 487, 501, 924 *A.*2d 533 (2007) (quoting *Mazza v. Bd. of Trs.*, 143 *N.J.* 22, 25, 667 *A.*2d 1052 (1995)).]

Furthermore, "we grant administrative agency action a 'strong presumption of reasonableness.'" *Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs*, 186 *N.J.* 5, 16, 890 *A.*2d 922 (2006) (quoting *Newark v. Natural Res. Council*, 82 *N.J.* 530, 539, 414 *A.*2d 1304 (1980)). An agency's findings of fact "are considered binding on appeal when supported by adequate, substantial and

hunting and fishing. Sportsmen, farmers, and commercial fishermen feel directly the impact of decision-making in this area and are likely to have the necessary expertise to make the required decisions competently.

The statute specifies that six of the eleven Council members must be sportsmen. Assuming this category consists of the hunters and fishermen of the state, *it is difficult to conceive of a group with a keener interest in maintaining a plentiful supply of game,* in developing regulations to insure [sic] safety in hunting, and in overseeing the operations of the state's hatching and game farm and its stocking activities.

[*Humane Soc. of the U.S. v. N.J. State Fish and Game Council,* 70 *N.J.* 565, 573, 362 *A.*2d 20 (1976) (emphasis added).]

credible evidence." *In re Taylor,* 158 *N.J.* 644, 656, 731 *A.*2d 35 (1999) (quoting *Rova Farms Resort, Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 484, 323 *A.*2d 495 (1974)).

When we review an "agency's interpretation of statutes within its scope of authority and its adoption of rules implementing its enabling statutes, we afford the agency great deference." *N.J. Soc'y for the Prevention of Cruelty to Animals v. N.J. Dep't of Agric.,* 196 *N.J.* 366, 385, 955 *A.*2d 886 (2008) (citing *In re Freshwater Wetlands Prot. Act Rules,* 180 *N.J.* 478, 488–89, 852 *A.*2d 1083 (2004)). As the Court noted, "[s]uch deference is appropriate because it recognizes that agencies have the specialized expertise necessary to enact regulations dealing with technical matters and are particularly well equipped to read . . . and to evaluate the factual and technical issues that . . . rulemaking would invite." *In re Freshwater Wetlands Prot. Act Rules, supra,* 180 *N.J.* at 489, 852 *A.*2d 1083 (internal quotation marks and citations omitted). Ultimately, our role is not to "micromanage" an agency but to recognize that unless the agency's action is inconsistent with its legislative authority, we will act with restraint and not intervene. *In re Failure by the Dep't of Banking and Ins.,* 336 *N.J.Super.* 253, 262, 764 *A.*2d 494 (App.Div.2001). Particularly relevant here, "the choice of accepting or rejecting testimony from witnesses resides with the administrative agency, and so long as that choice is reasonably made it is accorded deference on appeal." *In re Young,* 202 *N.J.* 50, 70–71, 995 *A.*2d 826 (2010) (citations omitted).

As the Court has long acknowledged:

[i]f a subject is debatable, the agency determination must be upheld. Quite obviously, if we were to decide the underlying merits, we would thereby perform the administrative function itself. Upon that approach the court would become the legislative body. The judiciary can interfere with such a determination only when it is plainly demonstrated to be arbitrary. The most that here is revealed is that men can earnestly disagree. This being so, the Council alone bears the responsibility for decision. It is not for the judiciary to agree or disagree.

[*United Hunters Ass'n of N.J., Inc. v. Adams,* 36 *N.J.* 288, 292, 177 *A.*2d 33 (1962) (citations omitted).]

We will affirm an agency decision if we find that the evidence and the inferences to be drawn therefrom support the decision, even if we would have reached a different result. *Campbell v. N.J. Racing Comm.*, 169 *N.J.* 579, 587, 781 *A.*2d 1035 (2001) (citing *Clowes v. Terminix Int'l, Inc.*, 109 *N.J.* 575, 588, 538 *A.*2d 794 (1988)). *See also In re the Certificate of Need of the Visiting Nurse Ass'n*, 302 *N.J.Super.* 85, 95, 694 *A.*2d 1038 (App.Div.1997). ("When there is room for two courses of action, an administrative decision will not be deemed arbitrary and capricious if exercised [sic] honestly and the course ultimately chosen is a reasonable one").

## B.

As we have previously observed, the Council is authorized to adopt appropriate and reasonable regulations regarding the circumstances under which game and fur-bearing animals may be "pursued, taken, killed, or had in possession" for the purpose of "providing an adequate and flexible system of protection, propagation, increase, control and conservation" of such animals, "and for their use and development for public recreation and food supply...." *N.J.S.A.* 13:1B–30. The Council may do so only "after first having determined the need for such action on the basis of scientific investigation and research...." *N.J.S.A.* 13:1B–30.

Appellants question the validity of the data and findings respondents used to justify the bear hunt.[4] Among other things, appellants claim that respondents utilized improper data, ignored relevant data, miscategorized complaints and misrepresented findings and predictions.

---

[4] In a motion filed ten days before oral argument, appellants moved to supplement the record by including data gathered from the 2010 hunt. We have reviewed the submission, and we grant the motion to supplement the record; however, we conclude that the data do not alter our ultimate conclusion as to the validity of the CBBMP. Moreover, despite appellants' claims, we find no basis upon which to conclude that the release of the data was in bad faith.

Appellants rely on experts' studies and opinions as well as their own perceptions and interpretation of the relevant data. Appellants challenge the factual predicates of respondents' conclusions. The record, however, demonstrates that respondents conducted significant scientific investigation of and research on the subject matter. They, too, relied on experts, including biologists, statisticians and wildlife personnel, significant public commentary on the issues before them and their own specialized expertise, developed from decades of experience managing the New Jersey black bear population.

Based on that research and knowledge, respondents concluded that a hunt was a necessary component of an "integrated approach to managing black bears," which also included "educating people about black bear ecology, recommending human behavioral judgments while in bear range, enforcing laws that minimize human-bear conflicts, taking action against dangerous and nuisance bears, monitoring the bear population and implementing population control." 42 *N.J.R.* 2790.

Respondents made a series of findings and conclusions to support this decision. First, despite the Department's extensive integrated bear management efforts, serious complaints of bear-human interaction had not abated as the bear population continued to expand. At present, black bear complaints are at historically high levels.

Second, bear hunting seasons can alleviate damage and nuisance incidents caused by problem bears. New Jersey's recent experience with black bear hunts supports this, as the population reduction achieved by the 2003 and 2005 bear hunting seasons resulted in short-term reductions in bear-related complaints received by DFW and cooperating law enforcement agencies.

Third, the New Jersey black bear population is large enough to sustain a hunt without endangering the population as a whole. Fourth, the 2003 and 2005 hunts demonstrated that bears could be harvested safely, and harvests could be accurately predicted. Fifth, no other viable method exists to reduce, or slow the growth

of, the black bear population. Although fertility control and sterilization have been studied, these methods of population control have not been effective.

Sixth, hunting is a safe, legal and responsible use of wildlife resources, as well as a legitimate and effective means to control over-abundant game species in a cost-effective manner. Black bear hunts are used to manage and control the black bear population in at least twenty-nine other states with resident black bear populations, including Pennsylvania and New York.

Appellants disagree with respondents' findings. However, simple disagreement, even if based on contradictory expert opinions, is insufficient to overcome the presumption of reasonableness ascribed to respondents' findings. *See United Hunters Ass'n, supra,* 36 *N.J.* at 292, 177 *A.*2d 33.

In *Mercer County Deer Alliance v. N.J. Department of Environmental Protection,* 349 *N.J.Super.* 440, 793 *A.*2d 847 (App.Div. 2002), we applied this standard to a challenge of the Council's adoption of rules for deer hunting as part of a community-based deer management plan. In rejecting the challenge, we found that "[i]t was clearly within the discretion of the Division and the Council to evaluate the available scientific literature and professional opinion and to determine which of various theories and approaches to adopt." *Id.* at 449, 793 *A.*2d 847.

We also rejected appellants' argument that there was insufficient evidence in the record to support the Council's decision to adopt certain special deer hunting rules, noting that it "require[d] little comment." *Ibid.* ("We reject the contention that the State Plan was adopted without sufficient scientific research and investigation as required by *N.J.S.A.* 13:1B–30. That simply is not so."). We determined that the rules were not improper merely because there was disagreement among the experts as to the means, methods and conclusions of the applicable science. *Ibid.* Instead, the critical inquiry was whether the Council's decision was based on scientific knowledge and investigation. We said:

[w]hile there may be some scientific dispute to the utility of standards based on biological and cultural carrying capacities as well as dispute as to the specific content of the standards, the fact remains, as this record demonstrates, that there is a wealth of respectable professional and scientific literature supporting the determinations represented by the Plan.

[*Ibid.*]

The same is true here. Despite the conflicting opinions, the CBBMP contains significant substantive professional and scientific support for its conclusions.

## III.

We address, seriatim, appellants' various challenges.

■ Appellants assert that respondents inflated their bear complaint data by: (1) double counting bear complaints that were both received by police departments and faxed by those departments to the Division; and (2) including in their 2009 figures complaints from previously unused sources, such as the Division's Emergency Response Communications Center (ERCC), thereby allegedly making comparison of its 2009 figures to prior years' figures "impossible." In support of this argument, appellants rely upon a study by Professor Edward A. Tavss of Rutgers University (Tavss Report).

Appellants also assert, again based on the Tavss Report, that respondents miscategorized bear complaints "with a slant towards categorizing complaints as more serious than they actually were," thereby compounding the inflation.[5] Appellants claim that, after correcting for these errors, the actual number of bear complaints in 2009 was 1170, rather than respondents' figure of 3804, and that the number of bear complaints has fallen, not risen. However, Commissioner Martin addressed appellants' claims in his November 22, 2010 letter, in which he refused to stay the bear hunt. As

[5] Bear complaints are sorted into three categories—I, II and III. Only the two most serious categories—I and II—are factored into the final bear complaint figure. *See* 42 *N.J.R.* 2785.

he noted, the DEP conducted a review of its bear complaint reports, and

> [a]fter identifying [the] reports that represent potential double-counting of same-day/same-location incidents, the Department concluded that such double-counting may affect only a fraction of reported incidents. Specifically, potential double-counting may have occurred in only 24 out of 2,844 recorded incidents (or .83%) in 2008, and only 13 out of 3,005 recorded incidents (or .43%) in 2009, resulting primarily from duplication of incidents reported both to the Department and to local police departments.

As a result of this review, Commissioner Martin stated, "I am convinced that the Department's black bear incident report data is accurate...."

The Commissioner also addressed the inclusion of bear complaints made to the ERCC, asserting that:

> beginning in 2008, the Department changed its procedures for handling incoming black bear incident calls. Prior to 2008, incoming calls were handled primarily by the [Division's] Wildlife Control Unit. Since mid-2008, the Department has sought to redirect such incoming calls to its Department-wide [ERCC].

Appellants rejoin that while respondents and intervenors focus on the issue of whether respondents' bear data are accurate, "the issue is not whether the 2009 data is [sic] accurate. The issue is whether the 2009 data can be meaningfully compared to the 2007 data." However, while appellants observe that the Council's meeting minutes acknowledge that the change in the way in which the number of bears in New Jersey was calculated "made it impossible to compare previous year information," effectively, appellants' argument would preclude respondents from making its black bear research more complete or accurate.[6]

---

[6] Appellants also assert that respondents acted in bad faith when they claimed that the CBBMP and the data contained therein were peer reviewed when in fact it was not. Respondents never claimed that the CBBMP was peer reviewed. In response to comments, the DEP responded, "[o]ur information is peer reviewed at seven universities," and in the CBBMP, it was noted that experts had reviewed DFW's population estimates and projections and had "confirmed the validity of the *methodology* used by the DFW in reaching its population estimates." 42 *N.J.R.* 2784 (emphasis added). Director Chanda later stated in a response to an Open Public Records Act (OPRA) request that "[w]e do not have

Under the circumstances, respondents' findings regarding the size of the New Jersey black bear population and the number of bear complaints, both in absolute terms and relative to previous years, do not appear arbitrary or capricious. While Professor Tavss' findings may contradict those upon which respondents rely, respondents questioned the Tavss Report,[7] and under the circumstances, that decision appears to have been reasonable and is entitled to deference. *See In re Young, supra,* 202 *N.J.* at 70–71, 995 *A.*2d 826.

Appellants also argue that respondents "ignor[ed] their own data" by claiming that a bear hunt serves the CBBMP's goal to "reduce the bear population" when the data demonstrate that bear hunting actually increases rather than decreases the bear population.[8] Appellants support this argument by pointing out that the 2005 CBBMP contained the estimate that the bear population would be 2694 in 2009, as opposed to the Division's current higher figure of 3438, and that this increase can be explained by "[a]n influx of subadult males upon removal of adult males," (quoting respondents' 1997 Black Bear Management Plan).

However, in their 2010 CBBMP, respondents found that New Jersey experienced a decrease in bear complaints after the 2003 and 2005 bear hunting seasons and that northeastern Pennsylvania experienced a similar decrease after implementing extended bear hunting in 2002. 42 *N.J.R.* 2780–81. Further,

any documents related to peer review of [the CBBMP because p]olicy documents are not peer reviewed." We do not deem these statements inconsistent.

[7] Intervenors claim that Tavss' research is flawed, citing critiques of Tavss by Gary Alt, Ph.D., a wildlife biologist, and assert that Tavss, as a chemist, is not qualified to render an expert opinion on the issue of bear management. This challenge supports the conclusion that bear management is an issue about which reasonable minds differ, and as such respondents are entitled to the deference the law requires.

[8] In doing so, appellants do not concede that respondents' bear population figures are accurate.

[t]he Council and DEP note that bear complaints in New Jersey had been rising since the 1990's and the Council and DEP believe this trend would have continued if the DFW had not implemented the integrated black bear management strategy in 2001, which utilized all the tools such as DFW's bear education program, training local police for bear response, lethal control on Category I bears, and the short term population reduction from the 2003 and 2005 black bear hunting seasons.

[42 *N.J.R.* 2781.]

The CBBMP then listed various examples upon which respondents based this opinion, including research by biologists studying the Northeast region of the United States demonstrating that decreases in bear complaints generally follow bear hunting seasons. The CBBMP concluded, "The Council and DEP believe these examples all support the premise that a regulated harvest, in conjunction with other bear management tools, can lead to a reduction in bear complaints." 42 *N.J.R.* 2781.

Intervenors also note that appellants' argument hinges on the assumption that respondents' 2005 predictions regarding what the black bear population would be in 2009 were correct. "Respondents merely predicted a certain number of bears would exist in 2009; it was not a fact there would be that number of bears in the absence of a hunt." It is just as feasible to conclude, as intervenors did, that "[h]ad there been no hunt in 2005, the 2009 actual population count likely would have been higher." As noted by intervenors, appellants fail to show their theory is anything more than speculation, such as by showing that a disproportionate number of adults were harvested compared to subadults, or by showing that a reservoir of subadults existed to repopulate the harvest areas. Under the circumstances, respondents' 2010 CBBMP findings regarding whether bear hunting reduces bear complaints do not appear arbitrary or capricious. They are well-supported by scientific data, and appellants' complaints amount to a disagreement with the data and the conclusions respondents drew from them. *See United Hunters Ass'n, supra,* 36 *N.J.* at 292, 177 *A.*2d 33.

Appellants next claim that respondents failed to consider cultural carrying capacity [9]—despite the fact that respondents' CBBMP claims that its goals are based on such information—and that respondents fabricated the existence of cultural carrying capacity findings where none exists. Appellants note, among other things, that in a November 9, 2010 response to an OPRA request for documents "related to any cultural carrying capacity studies on black bears in New Jersey . . . ," respondents failed to identify any responsive records. Appellants also maintain respondents ignored the fact that black bears have not reached their biological carrying capacity despite respondents' acknowledgement that biological carrying capacity should be considered in a black bear management policy.[10]

However, respondents address these issues in the CBBMP. The CBBMP notes that:

[t]he Council and DEP recognize that no state agency manages any wildlife species for biological carrying capacity. Managing a species for biological carrying capacity would be irresponsible to the species as well as the environment in which they live. The Council and DEP disagree that a black bear hunt should be contingent solely upon bears [sic] reaching their biological carrying capacity. . . . Thus, the black bear population management goals of the CBBMP consider the cultural carrying capacity . . . in concert with the biological carrying capacity of the land to support bears, just as it does for all wildlife species under the jurisdiction of the Council and [DFW].

[42 *N.J.R.* 2784–85.]

Also, as noted above, respondents based the CBBMP on scientific data and the opinions of experts, as well as decades' worth of their own specialized black bear expertise. Based on that data and expertise, respondents found that "serious [bear-related] incidences have increased with the increase in the bear population.

[9] In its 2010 CBBMP, respondents define "cultural carrying capacity" as "the number of bears that can co-exist compatibly with the local human population in a given area." 42 *N.J.R.* 2789.

[10] In its 2010 CBBMP, respondents define "biological carrying capacity" as "the maximum number of animals an environment can support without damage to the environment and while maintaining the animals in a healthy and vigorous condition." 42 *N.J.R.* 2784.

Of particular concern to the Council are increases in Category I incidents as the bear population has expanded," the occurrence of which "remain[s] unacceptably high." 42 *N.J.R.* 2793. These findings appear reasonable under the circumstances.

Appellants next make a number of assertions that, as a whole, claim respondents acted arbitrarily and capriciously with regard to predicting, collecting, reporting and reacting to information regarding the potential for over-harvesting the bears, particularly pregnant females. Specifically, appellants maintain that (1) respondents falsely claim that the sex and age structure of past harvests match that of bears captured during research and control activities when no such predictions were made and even if they were, the ratio of females to males harvested would be closer to one-to-one, rather than sixty-four percent female in 2003 and fifty-eight percent female in 2005; (2) contrary to respondents' claims, the CBBMP fails to protect pregnant females from the hunts; (3) respondents failed to consider the effects of over-harvesting female bears; and (4) respondents fabricated harvest number predictions for the 2003 black bear hunt. Appellants base these claims largely upon their own interpretations of respondents' data as well as studies and opinions of experts who disagree with respondents' findings. Regarding the claim that respondents fabricated harvest number predictions for the 2003 black bear hunt, appellants cite to past statements made by two particular Council members in an effort to show that no such predictions were ever made.

Respondents maintain that, while they had previously predicted based on data from 2002 that the sex ratio of the New Jersey bear population was one-to-one, and that the 2003 harvest would approximate that ratio, subsequent analysis has led respondents to conclude that New Jersey's bear population is female-biased. Respondents base this conclusion on data from the 2003 and 2005 hunts, as well as bear tagging research conducted in 2003. As a result, respondents assert that "statements in the adoption document and the CBBMP that the sex ratios of bears taken during

the State's 2003 and 2005 black bear hunts were representative of the State's population as a whole ... have proven to be accurate." Regarding the protection of pregnant females from the hunts, respondents assert that the CBBMP protects pregnant females because by December, "the majority of pregnant females ... will already have denned, and that additional protection against over-harvest is provided by the safeguard that allows for ceasing the hunt on twenty-four hours [sic] notice should biologists determine that an over-harvest could occur." Respondents do not directly address appellants' claim that respondents fabricated harvest number predictions for the 2003 black bear hunt.

Under the circumstances, respondents' findings are not arbitrary or capricious. They represent a considered view on one side of an honest disagreement between appellants and other experts with respect to the import of the data gathered about black bears in New Jersey. Such a disagreement provides an insufficient basis to overturn the decisions of an administrative agency. *See United Hunters Ass'n, supra,* 36 *N.J.* at 292, 177 *A.*2d 33. Although respondents do not address appellants' claims of fabrication, given the strong presumption of reasonableness to which the agency is entitled, *see Aqua Beach Condo. Ass'n, supra,* 186 *N.J.* at 16, 890 *A.*2d 922, appellants have failed to establish that respondents' predictions were, in fact, fabricated.[11]

■ Appellants next claim that respondents failed to consider the public safety risk posed by hunting. In support of this claim, appellants cite to statistics regarding the history of hunting accidents in New Jersey and claim that respondents "ignore the fact that many more people are killed and injured by hunters than by bears." However, as respondents and intervenors point out, the CBBMP addressed concerns regarding the safety risks posed by hunting. The CBBMP notes that "there were no hunting accidents

---

[11] The thrust of appellants' motion to supplement the record, *see* footnote 4, *supra,* focuses on the harvest figures for the 2010 hunt. The data reveal that the harvest yielded forty percent males and sixty percent females.

during the 2003 or 2005 bear hunting seasons" and that "[e]very hunter, regardless of age, must successfully complete the hunter education course in order to purchase his or her first hunting license." 42 *N.J.R.* 2783.

Respondents did not fail to consider the safety risks posed by hunting when they created the CBBMP, and they did not act arbitrarily or capriciously in enacting the hunt notwithstanding the potential safety risks.

Appellants assert that respondents acted arbitrarily and capriciously by dismissing the effectiveness of non-lethal bear management such as aversive conditioning. As evidence of this, appellants cite to studies purportedly demonstrating the effectiveness of aversive conditioning. Appellants also attempt to discredit respondents' claim that bear hunts reduce bear complaints by claiming respondents are ignoring drops in bear complaints experienced in years that did not follow a bear hunting season; based on these drops, appellants assert that "one cannot conclude that hunting reduces bear conflicts."

However, respondents did not "dismiss" non-lethal bear management methods. As part of their integrated approach to black bear management, respondents utilized multiple non-lethal bear management methods, such as: educating people living and recreating in bear habitat about methods to minimize negative human-bear interactions; supporting and enforcing legislation intended to reduce access by bears to human food and food waste; and employing non-lethal aversive techniques such as "rubber projectiles, pyrotechnics and specially trained dogs as a means of aversive conditioning to mitigate nuisance bear behavior." 42 *N.J.R.* 2780, 2790–91. Respondents also considered relocation and fertility control as means of bear population management, but dismissed both as ineffective and infeasible. 42 *N.J.R.* 2795. Ultimately, respondents concluded that while "aversive conditioning has limited short-term effectiveness, [it] does not eliminate nuisance behavior in bears and does nothing to reduce or stabilize the bear population." 42 *N.J.R.* 2780.

Also, as intervenors aptly note, appellants are essentially arguing that respondents may only employ a hunt as a last resort when necessary to control the bear population or reduce bear complaints. However, as noted above, the Council's enabling statutes permit it to consider "public recreation" when determining if and when game animals may be hunted, *see N.J.S.A.* 13:1B–30, indicating that there is no requirement that the hunt be a last resort. Appellants retort that the statute also provides that respondents may act only "after first having determined the *need* for such action...." *N.J.S.A.* 13:1B–30 (emphasis added). Respondents did determine that a hunt was necessary, and that decision was not arbitrary or capricious.

As a result, respondents' conclusions regarding the effectiveness of non-lethal bear management methods and the need to supplement those methods with a bear hunt are not arbitrary or capricious and are entitled to our deference.

■ Finally, appellants claim that respondents acted arbitrarily and capriciously and in bad faith in delaying publication of the adopted CBBMP in the New Jersey register until November 2010, while issuing bear hunt permits, conducting bear hunting seminars, and setting up bear check stations before the publication date. Appellants assert that by taking these steps to prepare for the bear hunt prior to publication, respondents facilitated a bear hunt before the CBBMP could be challenged in court. *See U.S. Sportsmen's Alliance Found., supra,* 182 *N.J.* at 479, 867 *A.*2d 1147. Respondents maintain that the delay in publication was due to their diligent effort to respond to the copious comments they received about the CBBMP. This explanation is reasonable. There is no evidence to support appellants' allegation of bad faith. Furthermore, the impact of the delay on appellants' ability to challenge the CBBMP in 2010 has no bearing on their ability to litigate in 2011. Accordingly, respondents' procedure for publishing the CBBMP was neither arbitrary nor capricious.

## IV.

Appellants assert that respondents violated the Administrative Procedures Act (APA), *N.J.S.A.* 52:14B–1 to –15. Specifically, appellants argue that respondents violated the APA by failing to respond to comments, responding disingenuously to comments, falsely characterizing comments, intentionally delaying adoption of the CBBMP to disadvantage appellants, and engaging in misconduct that denied appellants a full opportunity to voice their views during the public hearing on the CBBMP. We reject these claims and conclude that there was no violation of the APA.

To be valid, a rule must be adopted in "substantial compliance" with the APA. *N.J.S.A.* 52:14B–4(d). Under the APA, prior to adopting or amending any rule, an administrative agency must give notice of its intended action, *N.J.S.A.* 52:14B–4(a)(1), and afford interested parties a "reasonable opportunity to submit data, views, or arguments, orally or in writing." *N.J.S.A.* 52:14B–4(a)(3). Public comments should be "given a meaningful role" in the process of rule adoption. *In re Adoption of Rules Concerning Conduct of Judges*, 244 *N.J.Super.* 683, 687, 583 *A.*2d 403 (App.Div.1990). "The agency shall consider fully all written and oral submissions respecting the proposed rule" and "[p]repare for public distribution a report listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views and arguments contained in the submissions." *N.J.S.A.* 52:14B–4(a)(3)–(4). Among the purposes of the APA is "to give those affected by the proposed rule an opportunity to participate in the rule-making process, not just as a matter of fairness but also as a means of informing regulators of possibly unanticipated dimensions of a contemplated rule." *In re Comm'r's Failure to Adopt 861 CPT Codes*, 358 *N.J.Super.* 135, 142–43, 817 *A.*2d 355 (App.Div.2003) (citations and internal quotations omitted).

██ Appellants first assert that respondents ignored public comments concerning such matters as the impact of the hunt on the size and composition of the bear population, the dangers of hunting and the nature of the threat bears pose. Respondents claim that the record shows the 9000 comments were compiled and addressed.

Appellants cite to *Exxon Corp. v. Hunt*, 190 *N.J.Super.* 131, 462 *A.*2d 193 (App.Div.1983), *aff'd,* 97 *N.J.* 526, 481 *A.*2d 271 (1984), *aff'd in part and rev'd in part,* 475 *U.S.* 355, 106 *S.Ct.* 1103, 89 *L.Ed.*2d 364 (1986), where respondents informed appellants that their comments "need not be considered." *Id.* at 133, 462 *A.*2d 193. No dismissive rejection of appellants' comments occurred here. Respondents' responses were characterized by a thorough and careful analysis of each comment submitted. In the CBBMP, the Council responded to many issues raised by comments, including: the sex and age structure of the 2003 hunt; alleged fabrication of bear complaints and speculation about the increase of such fabrications; the human safety risks posed by hunting; and the dangers posed by bears as well as the frequency of deaths caused by bears. The Council's responses to these comments more than satisfied its statutory obligation to publish a summary of all comments received as well as its responses to such comments. *See N.J.S.A.* 52:14B–4(a)(4).

Appellants next maintain that respondents provided disingenuous responses to several comments, including: its response to a 2005 report authored by Professor Tavss; comments about aversive conditioning; bears' self-regulation; the dangers of hunting; whether the hunt was a trophy hunt; alternatives to hunting; and concerns about a bear relocation program. Respondents claim that they considered and addressed these issues in detail and responded to experts' analyses, articles and reports submitted.

Respondents note that conflicting opinions generated by responsive comments received during adherence to the procedures mandated by the APA do not require respondents to change their position to that of appellants. *See Mercer Cnty. Deer Alliance,*

*supra,* 349 *N.J.Super.* at 449, 793 *A.*2d 847 ("While there may be some scientific dispute ..., there is a wealth of respectable professional and scientific literature supporting the determinations represented by the Plan. It was clearly within the discretion of the Division and the Council to evaluate the available scientific litera- ture and professional opinion and to determine which of various theories and approaches to adopt."). The responses to appellants' comments were not disingenuous. Disagreement with a reasoned, supported agency determination does not give rise to an APA violation. Respondents did not violate the APA in their responses to appellants' comments.

▮ Appellants allege that respondents published the adoption of the CBBMP with a four-month delay and that they did so in bad faith. They claim that this was a tactic to force appellants to rush into court on the eve of the bear hunt and meet the higher standard of emergent relief. Appellants argue that during those four months, respondents implemented the bear hunt absent a valid comprehensive black bear management policy, in violation of the APA. *U.S. Sportsmen's Alliance, supra,* 182 *N.J.* at 479, 867 *A.*2d 1147 (requiring a comprehensive black bear management policy before holding a bear hunt); *N.J. Animal Rights Alliance v. N.J. Dep't of Envtl. Prot.,* 396 *N.J.Super.* 358, 934 *A.*2d 52 (App.Div.2007) (invalidating the 2005 CBBMP due to failure to follow APA procedures). Appellants conclude that respondents' bad faith delay and violation of the APA require that the CBBMP be invalidated.

Respondents assert that any delay in publication was the result of the considerable time and care the Council invested in reading, considering, organizing and responding to over 9000 comments. Intervenors note that appellants' allegation of bad faith is purely speculative; moreover, whatever hindrance the publication had on appellants' ability to challenge the 2010 bear hunt, the publication was available well in advance of the 2011 hunt.

Respondents did not violate the APA in publishing the CBBMP. Respondents cannot be faulted for devoting the time and energy

necessary to respond to the numerous comments received in response to the proposed CBBMP. Most important, any delay in 2010 has no bearing on appellants' ability to challenge the CBBMP in 2011.

Appellants argue that comments from Commenter # 754, John Donahue, Superintendent of the Delaware Water Gap National Recreation Area (DWGNRA), were misconstrued and inappropriately included in a list of comments that "supported the proposed CBBMP." In the response, respondents claimed that Donahue's comment commends respondents' efforts in developing the CBBMP, explains that he must cooperate with New Jersey and Pennsylvania to develop hunting regulations and offers to establish and manage bear check stations in the DWGNRA. The record reveals that Donahue recommends that the DWGNRA support higher bear densities than was recommended in the policy and commends the Council's non-lethal efforts to curb the black bear population in New Jersey. Although Donahue's comment does not similarly commend the Council for the hunting component of the CBBMP, he does not contradict the Council's statement that he is among the commenters who "indicated that hunting was the best tool available to control the black bear population." 42 *N.J.R.* 2776.

The APA requires that the agency comply substantially with its mandate that all comments be considered. Even if the Council misconstrued or perhaps exaggerated Donahue's comments and support for its actions, we cannot say that such response in isolation (or even assuming a minimal number of other such responses) would support a finding that respondents violated the APA.

Appellants also challenge respondents' failure to present a summary as well as to respond to questions at the public hearing. The APA requires that, "[a]t the beginning of each hearing ... the agency, if it has made a proposal, shall present a summary of the factual information on which its proposal is based, and shall respond to questions posed by any interested party." *N.J.S.A.*

52:14B–4(g). Appellants maintain that at the May 11, 2010 public hearing on the proposed CBBMP, respondents failed to present a summary of the factual information on which the Council's proposal was based. Furthermore, appellants claim that, while Division biologist Patrick Carr answered some questions, he refused to answer many questions at the public hearing and failed to provide explanations in the adoption document published in the New Jersey Register, in violation of the APA.

Respondents counter that the proposed CBBMP was available to the public before the public hearing and fully explained the basis for the proposed policy. 42 *N.J.R.* 753(a). The policy was summarized and its main components highlighted. Copies of the proposed policy were made available to attendees of the May 11, 2010 public hearing. Respondents informed attendees that those questions requiring lengthier responses than time allowed or those requiring review by the agency would receive responses after the close of public comment, which would be published in the New Jersey Register. With regard to specific questions about sex ratio and dangers of hunting raised during the hearing, respondents point to their responses to these comments in the record. Explanations of the various management tools available and evaluations of those proposed tools are contained in the proposed CBBMP and the later adopted CBBMP.

Here, while the better practice would have been to provide the summary, respondents substantially complied with the APA. Participants in the public hearing had access to the data and information that formed the basis of the Council's proposal. *See In re Adoption of Amendments and New Regulations at N.J.A.C. 7:27–27.1*, 392 *N.J.Super.* 117, 140, 920 *A.*2d 111 (App.Div.), *certif. denied*, 192 *N.J.* 295, 927 *A.*2d 1293 (2007) ("As to the disclosure issue, suffice it to say, the June 10, 2003 memo used data that [appellant] itself had supplied . . ., [and] there is no indication that [the documents] contained information on which DEP needed to rely. . . ."). *See also American Cyanamid Co. v. State*, 231 *N.J.Super.* 292, 309, 555 *A.*2d 684 (App.Div.1989) (acknowledging

that the model and technology used by the agency was not placed in the actual record on adoption of the regulation but noting that the data used by the agency is public information and holding that the agency's oversight did not cause substantial prejudice because the affected parties had access to the information).

We have previously observed that an agency's failure to respond to all questions during a hearing is not fatal to the agency's subsequent promulgation of the resulting regulation. *American Cyanamid, supra,* 231 *N.J.Super.* at 310, 555 *A.*2d 684 ("[i]n reaching our conclusion, we are mindful of the important public policies advanced by the safeguards established under the Administrative Procedure Act. We also recognize, however, that administrative agencies must possess the ability to be flexible. . . ."). Attendees of the public hearing had access to the proposed CBBMP and respondents provided either contemporaneous oral responses or written responses to the majority of questions raised during the hearing. Most important, participants in the hearing had an opportunity to be heard, the Council considered their concerns, and respondents substantially complied with the APA.

We conclude that respondents substantially met its obligations under the APA.

Affirmed.